646 P.2d 988

Ron POPE and Lynn Potthast, dba P & P Insulation & Siding, Grant Frederickson, dba Frederickson's Insulation Co.; Gene Hamilton, dba Hamilton Insulation & Roofing; Chris Clayville, dba Clayville Insulation; Bud Moore, dba Moore Insulation; and all other persons in the same class and like situations, Plaintiff-respondents,

v.

INTERMOUNTAIN GAS CO., an Idaho corporation, Defendant-appellant,

and

R. D. Grimm, President; Robert B. Hodge, Vice-president; Walter Smith, Vice-president; Reed Penning, Vice-president; Virginia Smith, Vice-president; and William Glynn, Defendants.

Nos. 13173, 13436.

Supreme Court of Idaho.

May 21, 1982.

Rehearing Denied June 24, 1982.

R. B. Rock and Jeffrey A. Strother of Moffatt, Thomas, Barrett & Blanton, Boise, for defendant-appellant.

Lloyd J. Walker, of Walker & Spink, Twin Falls, for plaintiffs-respondents.

BAKES, Chief Justice.

### I

Intermountain Gas Company appeals a judgment imposing treble damages against it for antitrust violations. In August, 1976, Intermountain Gas Company began selling and installing residential and commercial insulation. On October 1, 1976, Intermountain Gas created an internal non-utility division known as HomeGuard to operate the insulation business. HomeGuard first operated out of Boise, and in February, 1977, Twin Falls and Pocatello offices were established. However, there is also some evidence indicating that business was done in the Twin Falls and Pocatello areas prior to the establishment of separate offices. Competing insulators filed a class action against Intermountain Gas and its officers on January 19, 1977, alleging antitrust violations of I.C. §§ 48–101,[1] –102,[2] and seeking treble damages pursuant to I.C. § 48–114.[3] Later at trial, plaintiffs' complaint was amended to include I.C. § 48–104[4] as an additional basis for the action. The material allegation made by the plaintiffs against defendant in the complaint is as follows:

"The sales and installations of insulation have at times been below the cost of materials and labor to the corporate defendant. . . . The corporate defendant's conduct in establishing sales in the private sector by a regulated utility at prices below which they could reasonably expect to yield a profit is designed to restrain trade or to attempt to restrain trade and to monopolize or to attempt to monopolize the sale and installation of insulation in the State of Idaho."

---

1. "48–101. COMBINATION IN RESTRAINT OF TRADE ILLEGAL—PENALTY.—Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, within this state, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by fine not exceeding $5,000 or by imprisonment not exceeding one (1) year, or by both said punishments, in the discretion of the court."

2. "48–102. MONOPOLIES ILLEGAL—PENALTY.—Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce, within this state shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $5,000 or by imprisonment not exceeding one (1) year, or by both said punishments, in the discretion of the court."

3. "48–114. TRIPLE DAMAGES RECOVERABLE.—Any person who shall be injured in his business or property by any other person or persons by reason of anything forbidden or declared to be unlawful by this chapter may sue therefor in any court of record in this state in the county in which the defendant or defendants reside or are found, without respect to the amount in controversy, and shall recover threefold the damages by him sustained and the costs of suit, including a reasonable attorney's fee."

4. "48–104. UNFAIR COMPETITION ILLEGAL—PENALTY.—Every person, corporation, joint stock company, or other association engaged in business within this state, who shall enter into any contract, combination or conspiracy, or who shall give any direction or authority to do any act, for the purpose of driving out of business any other person engaged therein, or who for such purpose shall in the course of such business sell any article or product at less than its fair market value, or at a less price than it is accustomed to demand or receive therefor in any other place under like conditions or who shall sell any article upon a condition, contract or understanding that it shall not be sold again by the purchaser, or restrain such sale by the purchaser shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $5000 or by imprisonment not exceeding one (1) year, or by both said punishments, in the discretion of the court."

In addition, theories involving cornering the fiberglass insulation market and contracting to pay less than I.C.C. trucking rates for delivery of insulation were developed as the action progressed. Ninety-three potential class members were notified, of which forty-three eventually requested exclusion from the suit.[5] Eleven of the insulators appeared and testified at trial.[6]

On June 1, 1977, Intermountain Gas transferred all of the equipment being used by HomeGuard to Intermountain Gas Company Properties (IGCP), a separate corporation and wholly owned subsidiary of Intermountain Gas, which thereafter assumed the operation of the insulation business under the HomeGuard name. Intermountain Gas financed IGCP's insulation business by transfers of cash and payment of bills. The boards of directors for both IGCP and Intermountain Gas were the same. The officers for IGCP were also officers of Intermountain Gas. In March, 1978, due to continuing losses claimed to be the result of high overhead, IGCP closed out the insulation business.

The trial was held during May, 1978. At the conclusion of plaintiffs' case in chief, plaintiffs were permitted to amend their complaint to join IGCP as a defendant in the action.[7] Following trial, the court found that Intermountain Gas was liable for antitrust violations. The court did not

---

5. An initial notice of the class action was sent to ninety-three potential class members, and stated that they would be included as plaintiffs in the suit unless exclusion was requested. *See* I.R.C.P. 23(c)(2). Thereafter, a second notice was sent to the potential class members requesting an affirmative response by checking one of two boxes indicating inclusion or exclusion. Fifty-five responses to the second mailing were received, of which thirty-five requested exclusion, and twenty inclusion. At trial, seven additional plaintiffs who had responded in favor of inclusion were excluded upon request, as was one plaintiff who apparently had not initially responded. Although there are some fifty members of the class who have not asked for exclusion, that being the only method for exclusion provided for under I.R.C.P. 23(c)(2), it appears that the court below at times treated the action as pertaining only to the eleven insulators who affirmatively requested inclusion and who later testified at trial, *see, e.g.,* n. 8, *infra,* and such was done even though there were twenty affirmative responses to the second notice. *See* I.R.C.P. 23(c)(3). Thus, the amended judgment provided that "[e]ach plaintiff *remaining active* in this litigation at the time of the trial to the court shall be entitled to his share of the pool either by stipulation between all parties or by making application and providing separate proof as to the share each should receive." (Emphasis added.)

6. Those insulators testifying at trial were Ron Pope, Lynn Potthast, Joseph D. Becker, Dale W. Chappell, Chris Clayville, Wayne T. Cottle, Kenneth Farmer, Grant T. Frederickson, Gene Hamilton, Brad L. Hanaway, and Ralph Holden.

7. The motion to join IGCP as a party was made following plaintiffs' resting of their case, and following defendant's motion and argument in favor of an involuntary dismissal. The defendant had argued that at a minimum all evidence pertaining to the time period following June 1, 1977, the date of HomeGuard's transfer to IGCP, should be excluded because IGCP was not a party to the suit. Plaintiffs then moved to join IGCP. In objection to that motion, counsel for defendant stated, "We would not have had any problem with the complaint being amended prior to trial. We would have prepared our case, therefore, in accordance with an amendment prior to trial. It was not amended. We did not prepare our case accordingly." Tr. Vol. 4, p. 600. The court granted plaintiffs' motion to join IGCP over this objection. The court may, of course, pursuant to I.R.C.P. 21, add any party to an action at any stage of the proceeding so long as the terms of the joinder are just. However, that rule does not give the court license to join an additional party in violation of that party's constitutional right to procedural due process. *Moore v. Knowles,* 482 F.2d 1069, 1075 (5th Cir. 1973); *Sarne v. Fiesta Motel,* 79 F.R.D. 567 (D.C.Pa.1978). That right must be complied with if the terms of the joinder are to be just. Consequently a party which is to be joined must be served with summons and complaint in accordance with I.R.C.P. 3 & 4, and be given an opportunity to respond and to defend itself. *Moore v. Knowles, supra; Sarne v. Fiesta Motel, supra; Blum v. Postal Telegraph,* 60 F.Supp. 237 (D.C. Pa.1945). Without service of process, the court in fact has no jurisdiction over the purportedly joined party. *Sarne v. Fiesta Motel, supra; Bear Lake County v. Budge,* 9 Idaho 703, 711–12, 75 P. 614, 616–17 (1904); *see Yellowstone Pipeline Co. v. Drummond,* 77 Idaho 36, 43, 287 P.2d 288, 293 (1955). However, because no judgment was entered against IGCP, the question of whether the joinder of IGCP violated these standards was not raised on appeal, and we therefore do not reach a conclusion upon it.

find any violations or liability on the part of IGCP or the individual defendants, and judgment was rendered solely against Intermountain Gas, and not against the individual defendants or IGCP. Pertinent findings of fact and conclusions of law by the court were as follows:

"HomeGuard operated in the same territory as did Intermountain.

"At times HomeGuard sold and installed insulation at prices below their cost of materials and labor and below the costs of individual competitors.

"Intermountain purchased fiberglass insulation from Owens Corning Glass Company in volume lots and then sold back to Owens Corning at a profit. This occurred at a time when the independent insulators herein were either unable to get insulation from Owens Corning or were on a sharply limited quota basis.

"Intermountain contracted with McBride Insulation Company, Heyburn, Idaho, for McBride to haul insulation from the West Coast at 6% above cost, plus McBride's estimated hauling costs—about 50% of I.C.C. freight rates."

"Intermountain used funds acquired through its sanctioned monopoly in an attempt to create a subsidiary monopoly in the insulation business. All of its acts in this respect were in violation of Sections 48–101 and 48–102, Idaho Code.

"Intermountain conspired with its Home-Guard subsidiary in violation of Sections 48–101 and 48–102, Idaho Code.

"Intermountain violated Section 48–104, Idaho Code, by selling at a loss, by cornering the output of Owens Corning, and by its contract with McBride Trucking."

Damages were calculated as follows. The gross sales from the insulation business operated both by Intermountain Gas and IGCP beginning in August, 1976, and ending in March, 1978, were found to be $1,333,316.69. Since the trial court found that the insulation business had been operated at an overall loss of 5.33% totaling $75,137.43 during the entire period, the gross sales figure was increased by that sum to yield what the court apparently concluded should have been a break-even gross sales figure—$1,408,454.12, and that figure in turn was increased by 15%, apparently to obtain a gross sales figure which the insulation business would have achieved had it operated at a profit level which the court felt was reasonable. The resulting adjusted gross sales figure was $1,619,722.24. The court concluded that this figure represented the amount of business which the other insulators had been deprived due to the activities of Intermountain Gas. The court then proceeded to allocate that $1,619,722.24 among the other insulators, apparently on the theory that by violating the antitrust laws the defendant had either forfeited its right to be in the insulation business, or that but for the antitrust violations the defendant would not have obtained any business.

The formula used by the trial court consisted of the court dividing the adjusted gross sales figure, $1,619,722.24, among four submarket pools, *i.e.*, Boise, Nampa, Twin Falls and Pocatello, based upon estimates by those plaintiff insulators who testified as to the proportion of southern Idaho insulation business done in each of those geographical areas. For example, one or more witnesses estimated that the Twin Falls area insulators had about 30% of southern Idaho business. The Twin Falls pool was therefore established as 30% of $1,619,722.24, or $485,916.66. The court then determined the share of each submarket that the testifying plaintiffs[8] claimed to have possessed and multiplied the submarket pool by that figure. Thus, it was found that the "Twin Falls plaintiffs" had 90% of the Twin Falls area business,[9] and "thus

---

**8.** It seems clear from the record, though not explicit in the findings of the court, that the market share percentages reflect only that business claimed to have been done by the testifying insulators, and does not appear to include business attributable to the other non-

testifying class members or non-class members.

**9.** It appears from the record that the 90% figure refers to market share before HomeGuard

lost $437,324.99 of gross sales," *i.e.*, 90% of $485,916.66 from the Twin Falls submarket pool. Again, apparently finding that 15% was a reasonable net profit, the court took 15% of each of the adjusted submarket pools to establish the net profit lost in each submarket by the plaintiffs. Those figures were then trebled pursuant to I.C. § 48–114.[10] Finally, the court concluded by stating that "[a]fter final judgment herein the plaintiffs may either by stipulation or separate proof obtain an allocation of specific amounts for each plaintiff from such pools." As mentioned, the judgment was rendered against Intermountain Gas Company only, and not against IGCP or the directors of the two corporations who were also named as defendants.

On appeal, Intermountain Gas asserts that neither the law nor the evidence supports a finding of liability under I.C. §§ 48–101, –102, or –104.[11] In addition, appellant claims that the court's method of assessing damages is speculative and improper, and that there is also insufficient proof of damages under I.C. § 48–114 to permit a recovery by plaintiffs. Based on our review of the record, we conclude (1) that the evidence does not support the trial court's findings and conclusions as to the liability of Intermountain Gas for violation of the Idaho antitrust laws, and (2) that in any event there was insufficient proof of damages to support a judgment against Intermountain Gas. Consequently, the judgment of the trial court must be reversed. We will address the liability and damages issues separately.

entered the competition, although the court did not specifically so state in its findings.

**10.** The chart below indicates the final damage award and its division into submarket pools. The numbers in parentheses indicate the number of insulation firms which presented testimony of their submarket share of business. *See* n. 8, *supra.*

| Submarket | Lost Net Profits | Trebled Damages |
|---|---|---|
| Boise (1) | $ 18,039.66 | $ 54,118.98 |
| Nampa (2) | 44,279.15 | 132,837.45 |
| Twin Falls (4) | 65,598.75 | 196,796.25 |
| Pocatello (3) | 54,665.62 | 163,996.86 |
| Total | $182,583.18 | $547,794.54 |

Plus costs and attorney fees in the amount of $51,000.

## II

## LIABILITY

### A. Conspiracy

The trial court found that "Intermountain conspired with its HomeGuard subsidiary in violation of sections 48–101 and 48–102, Idaho Code."[12] This finding is unsustainable for several reasons, not the least of which is its ambiguity. HomeGuard never was a subsidiary of Intermountain Gas. Rather, it was an *internal division* of Intermountain Gas. IGCP, on the other hand, was a subsidiary of Intermountain Gas, but was not known as HomeGuard. Instead, HomeGuard was likewise an internal division of IGCP following HomeGuard's transfer by Intermountain Gas on June 1, 1977. Thus, one is unable to determine from the court's finding whether Intermountain Gas was supposed to have conspired with its own internal division (HomeGuard prior to June 1, 1977), IGCP, or both. Such a serious ambiguity in an important finding would of itself require at least a remand for clarification. The problems with this conclusion, however, do not end there.

As a matter of law, no conspiracy was possible between Intermountain Gas and HomeGuard prior to June 1, 1977. HomeGuard was a part of Intermountain Gas, and not an independent entity capable of conspiracy. Precedent firmly establishes that an internal division of a corporation is

**11.** I.C. §§ 48–101, –102, and –114 are patterned after §§ 1, 2, and 7 of the federal Sherman Antitrust Act. *Twin Falls Farm & City Distributing, Inc. v. D & B Supply Co.,* 96 Idaho 351, 354 n. 1, 528 P.2d 1286, 1289 n. 1 (1974). In interpreting and applying our state laws on these subjects, it is clear that while federal decisions are not binding on this Court, they do offer persuasive guidance. *See Southern Idaho Pipe & Steel v. Cal-Cut Pipe Co.,* 98 Idaho 495, 499, 567 P.2d 1246, 1250 (1977); *Simons v. Davenport,* 66 Idaho 400, 160 P.2d 464 (1945).

**12.** No finding of conspiracy was made under I.C. § 48–104, and consequently we do not address that issue.

incapable of conspiring with that corporation, since they are one and the same, and the plurality of actors required for conspiracy is absent. *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203 (5th Cir. 1969); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969), *cert. denied* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); *Ark Dental Supply Co. v. Cavitron Corp.*, 323 F.Supp. 1145 (D.Pa.1971), *aff'd* per curiam 461 F.2d 1093 (3d Cir. 1972); *Island Tobacco Co. v. R. J. Reynolds Tobacco Co.*, 627 P.2d 260, 273 (Haw.1981); Annot., 20 A.L.R.Fed. 682, 708–10 (1974).

█ In addition, we cannot agree with respondents' assertion that the trial court found a conspiracy between Intermountain Gas and IGCP. Reference to "HomeGuard subsidiary" might be construed to mean IGCP after June 1, 1977, since HomeGuard was a part of IGCP after that time. However, we think the phrase is so ambiguous that to interpret it in such a manner would be mere speculation, particularly in view of the trial court's decision to impose judgment only against Intermountain Gas and not against IGCP. The absence of a judgment against IGCP in fact clearly points to the conclusion that the court found no conspiracy between Intermountain Gas and IGCP. It is generally held that since a conspiracy requires the agreement of at least two individuals, a finding of conspir-

acy against one defendant cannot be upheld where the other alleged conspirators are tried and absolved of participation in the same proceeding. *See, e.g., Morrison v. California*, 291 U.S. 82, 93, 54 S.Ct. 281, 286, 78 L.Ed. 664 (1934) (holding in criminal prosecution for conspiracy that "the conviction failing as to the one defendant must fail as to the other"); *see generally* Annot., 91 A.L.R.2d 700 (1963). In view of the applicable law and the record before us, the trial court's finding that Intermountain Gas conspired in violation of I.C. § 48–101, and –102 cannot be sustained.[13]

### B. *Attempted monopoly.*

█ First, the record discloses that the trial court made no finding that a monopoly had been created by the defendant, and indeed, the record would not have supported such a finding. The trial court did, however, conclude that Intermountain Gas attempted to create a monopoly in violation of I.C. § 48–101 and –102. I.C. § 48–101 addresses only conspiracies or other combinations in restraint of trade. Since we have already concluded that the record does not support a finding that a conspiracy existed, and there is no conclusion by the trial court that there existed any other combination in violation of I.C. § 48–101, we are concerned in this part only with I.C. § 48–102. The basic elements necessary to

13. There is also a serious question of whether IGCP, a wholly owned subsidiary of Intermountain Gas, was capable of conspiring with its parent corporation. It is clear from the record that Intermountain Gas and IGCP were separate corporations, although tightly allied in that they shared the same directors, officers, and treasury. Only a minority of federal circuit courts hold that, as a matter of law, a parent and its wholly owned subsidiary, when separately incorporated, together provide the requisite plurality of actors for conspiracy. *See Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20, 33–34 and n. 49 (3d Cir. 1978), *cert. denied* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978); *H & B Equipment Co., Inc. v. International Harvester*, 577 F.2d 239, 244–45 (5th Cir. 1978). The majority of federal circuit courts, declining to place form over substance by adopting a blanket rule, have held that a single enterprise defense is available where the wholly owned

subsidiary is nothing more than the *alter ego* of the parent corporation. *Ogilvie v. Fotomat Corp.*, 641 F.2d 581 (8th Cir. 1981); *William Inglis & Sons Baking Co. v. I. T. T. Continental Baking Co.*, 668 F.2d 1014, 1054–55 (9th Cir. 1982); *Las Vegas Sun, Inc. v. Summa Corp.*, 610 F.2d 614, 617–18 (9th Cir. 1979), *cert. denied* 447 U.S. 906, 100 S.Ct. 2988, 64 L.Ed.2d 855 (1980); *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 726–27 (7th Cir. 1979), *cert. denied* 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980); *see Island Tobacco Co. v. R. J. Reynolds Tobacco Co.*, 627 P.2d 260, 273 (Hawaii 1981). However, the trial court's failure to enter judgment against IGCP is in effect a finding of no conspiracy between Intermountain and IGCP, and therefore it is unnecessary to determine at this time whether IGCP was the *alter ego* of Intermountain Gas and therefore incapable of conspiring with Intermountain Gas.

prove the charge of attempted monopoly under I.C. § 48–102 are (1) a *specific intent* by the defendant to monopolize, *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953); *Swift & Co. v. United States,* 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905), and (2) overt acts by the defendant which create a *dangerous probability* that the intended monopoly will be achieved, *American Tobacco Co. v. United States,* 328 U.S. 781, 785, 815, 66 S.Ct. 1125, 1127, 1141, 90 L.Ed. 1575 (1946) (approving jury instruction); *Swift & Co. v. United States,* 196 U.S. at 396, 402, 25 S.Ct. at 279, 281.[14] *See generally* Annot., 27 A.L.R.Fed. 762 (1976); 16B Business Organizations, Von Kalinowski, Antitrust Laws & Trade Regulations § 9 (1981). Unfortunately, the trial court's findings of fact and conclusions of law failed to address these crucial elements.

1. Findings and Conclusions.

■■■ When the court sits as the trier of fact, it is charged with the duty of preparing findings of fact and conclusions of law in support of the decision which it reaches. I.R.C.P. 52(a). *Compton v. Gilmore,* 98 Idaho 190, 560 P.2d 861 (1977); *Matheson v. Harris,* 98 Idaho 758, 572 P.2d 861 (1977). The purpose behind requiring the court to "find the facts specially and state separately its conclusions of law thereon" is to afford the appellate court a clear understanding of the basis of the trial court's decision, so that it might be determined whether the trial court applied the proper law to the appropriate facts in reaching its ultimate judgment in the case. *Perry Plumbing Co. v. Schuler,* 96 Idaho 494, 497, 531 P.2d 584, 585 (1975). The absence of

findings and conclusions may be disregarded by the appellate court *only* where the record is clear, and yields an obvious answer to the relevant question. *Perry Plumbing Co. v. Schuler, supra; see, e.g., Clements v. Clements,* 91 Idaho 732, 430 P.2d 98 (1967); *Call v. Marler,* 89 Idaho 120, 403 P.2d 588 (1965); *Merrill v. Merrill,* 83 Idaho 306, 362 P.2d 887 (1961). Absent such circumstances, the failure of the trial court to make findings of fact and conclusions of law concerning the material issues arising from the pleadings, upon which proof is offered, will necessitate a reversal of the judgment and a remand for additional findings and conclusions, unless such findings and conclusions would not affect the judgment entered, *In the Matter of the Estate of Lewis,* 97 Idaho 299, 302, 543 P.2d 852, 855 (1975); *Perry Plumbing Co. v. Schuler,* 96 Idaho at 497, 531 P.2d at 585; and, where there is no evidence which would support further findings material to the judgment, the judgment will simply be reversed, the plaintiff having failed to prove his claim.

■■■ In the present case, findings and conclusions concerning the issues of specific intent and dangerous probability were of critical importance since they formed the very essence of the attempted monopoly claim. These issues are complex and, therefore, demand careful analysis of both fact and law in their resolution. We are unable to say from the record before us whether the court below recognized or properly applied the elements of specific intent or dangerous probability in rendering its decision. However, our review of the record requires us to conclude that the evidence in support of these two elements is insufficient to prove a claim that Intermountain Gas was engaged in an attempt to monopolize, and

14. It should be noted that *Swift & Co. v. United States, supra,* was decided before Idaho adopted Section 2 of the Sherman Antitrust Act in 1911. Since there is no evidence of legislative intent to the contrary, it must be presumed that Section 2 was adopted with the prior construction placed upon it by the United States Supreme Court's decision in *Swift & Co. v. United States, supra. City of Weippe v. Yarno,* 96 Idaho 319, 528 P.2d 201 (1974). It should also be noted that there has been some disagreement by one federal circuit as to what the basic elements of attempted monopoly are, differing in particular as to the requirement of dangerous probability. *See Lessig v. Tidewater Oil Co.,* 327 F.2d 459 (9th Cir. 1964), *cert. denied* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 *but see Hunt Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919 (9th Cir. 1980); *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848 (9th Cir. 1977), *cert. denied* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978).

therefore, while we reverse the judgment, we do not remand for further findings.

## 2. Specific Intent.

 Generally, since there is rarely any direct evidence of specific intent to monopolize, its existence may be inferred from anti-competitive conduct of the defendant. *See* Annot., 27 A.L.R.Fed. 762, 775–85 (1976); Hawk, Attempts to Monopolize-Specific Intent as Antitrust's Ghost in the Machine, 58 Cornell L.Rev. 1121, 1137 (1973); 16B Business Organizations, Von Kalinowski, Antitrust Laws & Trade Regulations § 9.02[5] (1981). Certainly, any conduct that constitutes a restraint of trade under I.C. § 48–101 would provide a strong basis for inferring specific intent to monopolize. *See William Inglis & Sons Baking Co. v. I. T. T. Continental Baking Co.*, 668 F.2d 1014, 1028 (9th Cir. 1982); 27 Annot., A.L.R.Fed. 762 (1976). Nevertheless, a finding that a defendant has engaged in a particular predatory or illegal act, such as selling below cost,[15] is not the equivalent of finding specific intent, but is merely a basis from which such intent may be inferred. Isolated or occasional instances of selling below cost, while predatory or illegal in nature, do not necessarily indicate a specific intent to monopolize. To hold otherwise would render the requirement of specific intent a nullity. As one court has stated in the same context, "Too heavy a reliance on circumstantial evidence incurs the risk of reducing almost to the point of extinction the existence of the requirement." *William Inglis & Sons Baking Co. v. I. T. T. Continental Baking Co.*, 668 F.2d at 1027. The existence of specific intent must, therefore, be determined by weighing all of the circumstances in the particular case, including the nature of the conduct, its consistency and duration, the conditions of the market, and characteristics of the defendant. *William Inglis & Sons Baking Co. v. I. T. T. Continental Baking Co., supra.*

In the present case, the trial court found that "[a]t times HomeGuard sold and installed insulation at prices below their cost of materials and labors ...." (Emphasis added.) However, as noted, *supra* at n. 15, selling below the simple cost of materials and labor does not establish predatory pricing. Nevertheless, notwithstanding the incorrect standard applied by the district court, the plaintiffs failed to elicit at trial evidence of HomeGuard's cost of doing business. Consequently, there is nothing in the record from which it can be determined that HomeGuard was pricing its sales and

---

15. We note that I.C. § 48–102 does not speak in terms of prohibiting sales below cost. The phrase "below cost" in the world of economics is, without further definition, an imprecise term, not always indicative of anticompetitive conduct. *See* Areeda & Turner, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, 88 Harv.L.Rev. 697 (1975). The offense which Section 2 of the Sherman Act is intended to guard against under such circumstances as presented here is that of "predatory pricing." One economic test for proving predatory pricing that has found favor in several federal circuits was developed by Areeda & Turner, *supra*, and employs the use of marginal and average variable costs of production. *See William Inglis & Sons Baking Co. v. I. T. T. Continental Baking Co.*, 668 F.2d 1014 (9th Cir. 1982); *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427 (7th Cir. 1980); *Janich Bros. Inc. v. American Distilling Co.*, 570 F.2d 848 (9th Cir. 1977), *cert. denied* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *Int'l Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714, 724 (5th Cir. 1975), 424 U.S. 943 (1976). The general rule under that theory is that a price should not be considered predatory if it equals or exceeds the marginal cost or average variable cost of producing the product. It is clear from the Areeda/Turner test that selling below average total cost, *i. e.*, that portion of the firm's total costs—both fixed and variable—attributable on an average basis to each unit of output, does not establish predatory pricing. Recently the Ninth Circuit stated the following on the subject: "Pricing below average total cost may be a legitimate means of minimizing losses, particularly when the firm is 'temporarily' experiencing 'excess capacity' in its productive facilities. When this is the case, the firm's average variable cost—the sum of those costs that vary with output divided by the total units of output—generally will be less than the firm's marginal cost—the variable cost associated with producing the last unit of output. Prices below the average total cost of production, but above the average variable cost, may represent a legitimate means of minimizing losses during the period of inadequate demand." *William Inglis & Sons Baking Co. v. I. T. T. Continental Baking Co.*, 668 F.2d 1014, 1035 (9th Cir. 1981).

installations of insulation in a predatory manner. In *Hanson v. Shell Oil Co.*, 541 F.2d 1352 (9th Cir. 1976), *cert. denied* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792, the 9th Circuit, applying the Areeda/Turner test of predatory pricing, *see* n. 15, *supra*, affirmed a directed verdict in favor of the defendant where the plaintiff had introduced no evidence that the defendant's prices were less than its marginal cost. The court there stated that "Hanson's failure to show that Shell's prices were below its marginal or average variable cost was a failure *as a matter of law* to present a *prima facie* case under Section 2." 541 F.2d at 1359 (emphasis added). In the present case, there is not only an absence of evidence of HomeGuard's marginal or average variable costs, there is no evidence of HomeGuard's costs of any kind. Plaintiff has thus failed to establish, as a matter of law, that Home-Guard was engaged in predatory pricing in violation of I.C. § 48–102.

While there was testimony that some of the bid prices upon which HomeGuard was successful in obtaining work were below the cost of materials and labor of some *testifying plaintiffs*, there was no evidence or finding that plaintiffs' costs were the same as defendant's costs. Without such a showing, evidence of plaintiffs' costs was irrelevant to a claim of predatory pricing by the defendant. Since there is no evidence to support a finding that HomeGuard engaged in predatory pricing, there can also be no inference of specific intent to monopolize on that basis.

The trial court also found that "Intermountain bought fiberglass insulation from Owens Corning in volume lots and then sold it back . . . at a profit," and that "Intermountain contracted . . . for McBride to haul insulation at . . . about 50% of ICC freight rates." If these were predatory or illegal actions they would, of course, aid the

trier of fact in drawing an inference of specific intent to monopolize. However, the findings without more do not show illegal or predatory conduct. Furthermore, they do not address the extent of these practices, and it does not appear from the record that the trial court considered them for the purpose of analyzing the question of specific intent to monopolize.

As to Intermountain's dealings with Owens Corning, neither buying in volume nor selling back at a profit is of itself illegal [16] or inherently predatory. *United States v. Griffith*, 334 U.S. 100, 108, 68 S.Ct. 941, 946, 92 L.Ed. 1236 (1948). Such practices may become illegal or predatory only when used as methods of achieving a corner on a market, *i.e.*, obtaining extensive control over the supply of a product so that the product's price might be artificially set in a manner most profitable to the controlling party. *See, e.g., United States v. Patten*, 226 U.S. 525, 540–41, 33 S.Ct. 141, 144–45, 57 L.Ed. 333 (1912). A determination that such control or pending control exists, however, cannot be made without reference to both the quantity of supply of the particular product (Owens Corning fiberglass insulation), and the defendant's share of control over that supply. Such information provides a necessary basis for ascertaining whether acquisitions by the defendant were so extensive that it obtained or was at least threatening (in the case of attempted monopoly) to obtain a corner on a particular market.

In the present case, there is no evidence to indicate what measure of Owens Corning fiberglass insulation was available to insulators in the relevant market area. Thus, there is no means of determining whether Intermountain's volume purchases of fiberglass insulation threatened control of the product, thereby making that method of

---

**16.** Respondents argue that selling back at a profit was really an illegal rebate under I.C. § 48–110. First, this section was never asserted at trial, and the trial court made no findings upon it. Second, I.C. § 48–110 refers to rebates obtained by a common carrier to transport property at less than a legally allowed rate. While this section might have some bearing upon the McBride contract, there is nothing in the record to indicate its relevancy to Intermountain/Owens Corning transactions. As for its relevance to the McBride contract, there is nothing in the record to indicate that any consideration other than that stated in the contract was passed between Intermountain and McBride.

purchase a predatory practice which could support an inference of specific intent. In fact, the evidence at most shows only two purchases of fiberglass insulation by Intermountain Gas from Owens Corning. This is in contrast to the monthly purchases in carload quantities of fiberglass insulation by at least one of the plaintiffs, Joseph Becker, a Pocatello insulator. In addition, the unrebutted testimony of Norman Leavitt, a HomeGuard regional manager, indicated that as far as the sale of fiberglass insulation was concerned, HomeGuard was constantly underbid by other insulators, and HomeGuard was unable to obtain enough insulation jobs requiring fiberglass insulation to move its inventory of that product. Consequently, HomeGuard resold some of the product back to Owens Corning which was at that time having difficulty in meeting the great demand upon it because of the national demand for fiberglass insulation brought on by the energy crisis. In sum, the evidence is quite insufficient to show that HomeGuard was ever threatening control over the supply of fiberglass insulation, and we see no rational basis for inferring specific intent to monopolize from the actions of HomeGuard in relation to its transactions with Owens Corning.

As far as the McBride contract is concerned, the only evidence on the subject was McBride's testimony, and the testimony of Douglas Lyke, vice-president and general manager of HomeGuard. McBride testified that his company, McBride Insulation, was both a wholesale and a retail distributor of insulation, and that the insulation which it had delivered to Intermountain was from McBride's own stock. Lyke testified that initially HomeGuard purchased insulation from the manufacturer, Fibron, which HomeGuard in turn shipped by means of common carrier; but that later HomeGuard purchased the Fibron manufactured insulation from McBride Insulation, which sold from its own inventory and then delivered the insulation itself.

 Private carriage of one's own stock-in-trade is not subject to I.C.C. regulation as long as the transporter's primary business is a non-carrier commercial enterprise, and the carriage is in *bona fide* furtherance of that primary business. 49 U.S.C. § 303 (1976) (repealed 1978, current version at 49 U.S.C. §§ 10102 & 10524); *Red Ball Motor Freight, Inc. v. Shannon*, 377 U.S. 311, 84 S.Ct. 1260, 12 L.Ed.2d 341 (1964); Lenoir Chair Co. Contract Carrier Application, 51 M.C.C. 65, 75 (1949), *aff'd sub nom. Brooks Transp. Co. v. United States*, 93 F.Supp. 517 (D.C.Va.1950), *aff'd* 340 U.S. 925, 71 S.Ct. 501, 95 L.Ed. 668 (1951). The trial court in this case found that "Intermountain contracted with McBride Insulation Company, Heyburn, Idaho, for McBride to *haul* insulation from the west coast." (Emphasis added.) While not explicitly stated, the implication of that finding is that McBride was hauling insulation other than its own stock-in-trade. The evidence in no way supports such a finding. Rather, the evidence clearly indicates that McBride purchased the insulation from Fibron and was therefore hauling its own goods.

The question to be asked in this situation is whether McBride's carriage of the insulation to HomeGuard was in *bona fide* furtherance of its primary business of wholesale and retail sales of insulation, or whether the carriage was simply a "secondary enterprise with the purpose of profiting from the transportation performed." *Red Ball Motor Freight, Inc. v. Shannon*, 377 U.S. at 315, 84 S.Ct. at 1263. The court below made no finding on that question. Absent a finding that McBride's carriage of insulation was not in *bona fide* furtherance of its primary business, it cannot be said that HomeGuard and McBride Insulation were parties to an illegal contract. *See, e.g., Taylor v. Interstate Commerce Comm'n*, 209 F.2d 353 (9th Cir. 1953), *cert. denied* 347 U.S. 952, 74 S.Ct. 677, 98 L.Ed. 1098 (1954). As a result, there is also no basis in the court's findings concerning the McBride contract which would support an inference of specific intent to monopolize on the part of Intermountain Gas. While this particular question could be remanded to the trial court for further findings, we decline to do so in view of our holding below that there existed no dangerous probability

that Intermountain Gas would monopolize the insulation market.

### 3. Dangerous Probability.

 In addressing a claim of attempted monopoly, the United States Supreme Court, in *Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905), stated the following:

> "Not every act that may be done with intent to produce an unlawful result is unlawful, or constitutes an attempt. It is a question of proximity and degree. The distinction between mere preparation and attempt is well known in the criminal law. [Citation omitted.] The same distinction is recognized in cases like the present."

Thus, the rule has been firmly established that in order to prove an attempted monopoly, it is necessary to show not only specific intent to monopolize, but also a dangerous probability that the monopoly will be achieved. *See* Annot., 27 A.L.R.Fed. 762, 786–89 (1976) (citing profuse authority). To determine whether a defendant is dangerously close to obtaining monopoly power, it is necessary for the court to measure and evaluate the degree of market power which the defendant possesses. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965); see Annot. 27 A.L.R.Fed. 762, 789–90 (1976). There is, however, no set degree or percentage of market power which must be possessed in order for a defendant to be dangerously close to achieving a monopoly. Rather, in order to determine whether there is a dangerous probability that a monopoly will be achieved, the extent of market power must be evaluated in conjunction with prevailing market conditions, as well as the business policies and performance of the defendant. *See* 16B Business Organizations, Von Kalinowski, Antitrust Laws & Trade Regulations § 9.01[2] (1981). As a corollary, it can

be stated that a dangerous probability of monopolization by a defendant with a given market power will be much less likely to exist in a very competitive market as opposed to a static market. *See, e.g., Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 668 (9th Cir. 1980); *United States v. Empire Gas Corp.*, 537 F.2d 296, 305–08 (8th Cir. 1976), *cert. denied* 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977); *Yoder Bros., Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1368–69 (5th Cir. 1976), *cert. denied* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977); *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 (5th Cir. 1969); *General Communications Engineering, Inc. v. Motorola Communications & Electronics, Inc.*, 421 F.Supp. 274, 291–92 (N.D.Cal.1976).

The record is clear that the product market involved in this case, *i.e.*, sales and installation of insulation, was a highly competitive one, having low barriers to entry, and that under even a liberal assessment of HomeGuard's market power in the area, it was insufficient to support a finding that there existed a dangerous probability of monopolization. Appellants point out that the record discloses that HomeGuard had at *most* 24% of the insulation market, and the respondents have not challenged that figure. After reviewing the evidence, we agree that liberally construing the record, HomeGuard could have had not more than 24% of the insulation market [17] and that in light of the highly competitive nature of the market involved, the claim of attempted monopoly must fail. *See, e.g., United States v. Empire Gas Corp., supra* (50% of market did not support dangerous probability); *General Communications Engineering, Inc. v. Motorola Communications & Electronics, Inc., supra* (no dangerous probability with 60% of market).

### 4. The *Griffith* case.

The respondents argue that under *United States v. Griffith*, 334 U.S. 100, 68 S.Ct. 941,

---

**17.** This figure is based upon the gross sales figures of nine of the testifying plaintiffs compared against the gross sales figures of the HomeGuard operation. It is clear that not only does this calculation not include all of the testi-

fying plaintiffs, but it also does not include any of the business performed by the other eighty-two potential class members who were notified of the class action. Thus the 24% figure is more than liberal.

92 L.Ed. 1236 (1948), the existence of a monopoly, lawful or unlawful, obviates the need to show specific intent or dangerous probability when the claimed violation is the use of existing monopoly power to obtain advantage in a secondary market.

In *Griffith*, four affiliated corporations operated movie theaters in several states. With minor exceptions, the movie theaters of the affiliated corporations did not compete with each other. In 62% of the towns in which these corporations operated, there was no competition. The corporations asserted their combined influence to obtain very favorable contracts with film distributors, including *exclusive* rights to first and second run movies in the particular area. The effect in those towns where there was competition was that competitors were foreclosed from competing. Thus, the defendants employed their original monopoly power to obtain control in the film distribution market and then funneled the benefits back to strengthen their theater monopoly.

■ In reviewing the *Griffith* case, two points should be noted. First, the *Griffith* defendants used their monopoly power at the theater level to acquire advantage or control within the *distribution chain* of the relevant theater product, *i.e.*, films. Second, the defendants were successful in achieving a *restraint of trade, i.e.*, exclusive film rights, within an additional market of that same film distribution chain. In first analyzing the situation, the Supreme Court said the following:

> "It is, however, not always necessary to find a specific intent to restrain trade or to build a monopoly in order to find that the antitrust laws have been violated. It is sufficient that a restraint of trade or monopoly results as the consequence of a defendant's conduct or business arrangements." 334 U.S. at 105, 68 S.Ct. at 944.

Respondents place great weight on this language. However, immediately thereafter the Court went on to state:

> " '[N]o monopolist monopolizes unconscious of what he is doing.' Specific intent in the sense in which the common law used the term is necessary only

where the acts fall short of the results condemned by the act.... 'Where acts are not sufficient in themselves to produce a result which the law seeks to prevent—for instance, the monopoly—but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen.' " *Id.*

Thus, it is clear that the Court recognized the necessity of showing specific intent in attempted monopoly cases.

The Court then further stated that the trial court found no intent or purpose to restrain trade or to monopolize, and thus the question before it was "whether a necessary and direct result of the master agreements was the *restraining or monopolizing* of trade within the meaning of the Sherman Act." 334 U.S. at 106, 68 S.Ct. at 945 (emphasis added). In effect, the issue was whether the requirement of specific intent was either unnecessary or satisfied by the detrimental *results obtained* by the defendants. Although it appears clear from the opinion that there was at least a restraint of trade, there was no statement as to whether the actions of the defendants accomplished a monopoly in the additional market of film distribution. The Court, however, did make the following conclusion:

> "[H]e is using monopoly power to expand his empire. And even if we assume that a specific intent to accomplish that result is absent, he is chargeable in legal contemplation with that purpose since the end result is the necessary and direct consequence of what he did. [Citations omitted.]
>
> "*The consequence of such a use of monopoly power is that the films are licensed on a non-competitive basis in what should otherwise be competitive situations.* That is the effect whether one exhibitor makes the bargain with a distributor or whether two or more exhibitors lump together their buying power, as appellees did here. It is in either case a misuse of monopoly power under the Sherman Act. If monopoly power can be

used to beget monopoly power, the act becomes a feeble instrument indeed." 334 U.S. at 108, 68 S.Ct. at 946 (emphasis added).

Assuming that the Court meant only to find a restraint of trade rather than an actual monopoly in the additional market of film distribution, it appears that the Supreme Court considered the attempted monopolization elements of specific intent and dangerous probability to have been met under the particular circumstances.[18] The decision is therefore to be interpreted to mean that the specific intent and dangerous probability requirements of attempted monopolization are fulfilled when it is shown that (1) an entity possesses monopoly power, (2) that monopoly power has been employed so that an actual restraint on trade has been accomplished, and (3) the restraint has been obtained in an additional market within the *distribution chain* of the relevant product.

This conclusion is also supported by the more recent decision in *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), where the United States Supreme Court applied *Griffith* to uphold a § 2 violation of attempted monopoly. Otter Tail was a public utility selling electricity at both wholesale and retail levels. Several communities had endeavored to establish their own electric power distribution systems. However, Otter Tail refused to sell wholesale electric power to cities that it had previously served at the retail level. Otter Tail also refused to permit the use of its transmission lines to move (or wheel) electric power purchased from other bulk distributors of electric power to the cities in question.

Initially, the Court held that while Otter Tail's legal monopoly in the electric power market constituted an exception to the application of the antitrust laws, misuse of that monopoly power was subject to antitrust regulation. Then, in upholding the § 2 violation, the Court stated the following:

"The record makes abundantly clear that Otter Tail used its monopoly power in the towns in its service area to foreclose competition or gain a competitive advantage, or to destroy a competitor, all in violation of the antitrust laws. *See United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945–46, 92 L.Ed. 1236. The district court determined that Otter Tail has 'a strategic dominance in the transmission of power in most of its service area' and that it used this dominance to foreclose potential entrants into the retail area from obtaining electric power from outside sources of supply. [*U. S. v. Otter Tail Power Co.,*] 331 F.Supp. [54] at 60. Use of monopoly power 'to destroy threatened competition' is a violation of the 'attempt to monopolize' clause of section 2 of the Sherman Act." 410 U.S. at 377, 93 S.Ct. 1029.

The Court mentioned neither specific intent nor dangerous probability. It merely gave citation to *Griffith*. It seems clear, however, that the same factors involved in *Griffith* were also applicable to *Otter Tail* : (1) the defendant possessed monopoly power which (2) was used to accomplish a restraint on trade, *i.e.*, refusal to deal, and (3) the restraint was employed within the distribution chain of the product market, *i.e.*, electric power. *See also* Hawk, Attempts to Monopolize—Specific Intent as Antitrust Ghost in the Machine, 58 Corn.L.Rev. 1121, 1156 (1973).

In applying these criteria to the present case, we conclude that the *Griffith* standard is not applicable. The first factor, monopoly power, is of course present as in *Otter Tail*, due to Intermountain's legal monopoly in the product market of natural gas. However, as discussed earlier, the record in this case is lacking in both proof and findings supporting an accomplished restraint of trade. Finally, unlike the situations in *Griffith* and *Otter Tail*, HomeGuard's insulation business was not an activity in a market which was part of the *same distri-*

---

18. Although the Supreme Court also found a violation of section 1 for conspiracy to restrain trade, it is clear from the above quote that the result would have been the same absent a sec-

tion 1 violation of conspiracy, and that the restraint of trade involved had an independent bearing upon the section 2 violation.

232

bution chain as its legally monopolized product of natural gas. The market for the sale and installation of insulation is not dependent upon the sale or transmission of natural gas. In fact, insulation reduces the demand for natural gas and other energy sources. Thus, this case is quite distinguishable from *Griffith* and *Otter Tail*.

The respondent further argues in essence that Intermountain's legal monopoly as a distributor of natural gas gives it great financial leverage which automatically subjects it to the *Griffith* standards.[19] Assuming that the record reflects such leverage, this argument is still untenable. Financial leverage is not uniquely held by monopolists. It is also held by many businesses operating in competitive markets. In fact, financial leverage is not in all circumstances attendant to a monopoly position. The *Griffith* Court recognized the legitimate benefits of financial leverage when it stated that "large-scale buying is not, of course, unlawful *per se.*" 334 U.S. at 108, 68 S.Ct. at 946. The factor in *Griffith* that made the leverage dangerous was not the use of financial leverage *per se*, but the fact that defendant used its dominance of theater outlets in the market area not only to obtain first and second run movies for itself, but to preclude its competitors from obtaining first and second run films. Thus, in *Griffith* the monopolist used its dominance to successfully restrain competitors from obtaining the product, *i.e.*, first and second run films, and that dominance, coupled with its successful use in restraining trade, made a monopoly of first and second run films so likely that the elements of specific intent and dangerous probability were deemed satisfied. However, use of financial leverage alone by a monopolist in an unrelated product area does not necessarily present a greater danger than would the use of the same financial power by a non-monopolist.

Had the court found that Intermountain Gas engaged in predatory pricing in the sale of gas-dependent appliances, *see Southern Blowpipe & Roofing Co. v. Chattanooga Gas Co.*, 360 F.2d 79 (6th Cir. 1966), or refused to sell its monopolized product, natural gas, to break competition, as in *Otter Tail*, the situation might have been different. However, such is not the case, and we find *Griffith* and *Otter Tail* inapplicable to the case at bar.

### C. *I.C. § 48–104.*

The trial court concluded that "Intermountain violated section 48–104, Idaho Code, by selling at a loss, by cornering the output of Owens Corning, and by its contract with McBride Trucking." As to cornering the market, we have previously determined that the evidence is insufficient to support such a finding. Similarly, as also discussed earlier, the court's findings do not support a conclusion that the McBride contract was illegal. See Part II(B)(2), *supra*. That leaves the trial court's conclusion that Intermountain sold at a loss in violation of I.C. § 48–104.

■ Of particular application here is the language of I.C. § 48–104 which prohibits the selling of "any *article or product* at less than its fair market value, or at a less price than it is accustomed to demand or receive therefor in any other place under like conditions." (Emphasis added.) The clause plainly applies only to the sale of an "article or product." The sale of services is not included within the statutory language. In the present case, plaintiff sought to apply this prohibition to the "sales and *installations* of insulation." (Emphasis added.) Similarly, the court found that "[a]t times HomeGuard sold and *installed* insulation at prices below their cost of materials and *labor*." (Emphasis added.) The evidence in

19. In regard to the source of Intermountain's funding of the insulation business, it is clear that only stockholder funds in the form of retained earnings were utilized and that none of Intermountain's nonutility business affected charges to ratepayers. William Glynn, chief financial officer of Intermountain Gas, testified under questioning by plaintiff appellants' counsel that Intermountain kept carefully segregated utility and non-utility accounts, that the PUC set utility rates based only on the utility accounts and costs of utility service, and that the insulation business was financed out of stockholder funds in the form of retained earnings, and not from any source which might be termed "ratepayer funds."

the record reflects that in nearly every instance the bids were made upon lump sum bids based in part on a square footage basis, installed in the structure to be insulated. The bid price included both the cost of the product and the charge for installing it. It is apparent from the record that the trial court, in concluding that Intermountain was "selling at a loss" in violation of I.C. § 48–104, was applying the prohibition of that section against both the sale of the product and the charge for the services and equipment used for installation. Since the sale of services and the charge for the use of equipment is not included within the above statutory language, the court's finding cannot be sustained by the record.

▮ Furthermore, I.C. § 48–104 prohibits the selling of "any article or product at less than its fair market value," not "at a loss", as expressed by the trial court. Market value has been defined as the price that a reasonably prudent purchaser would pay for the relevant product under the market conditions prevailing at the period of time in question. *State ex rel. Moore v. Bastian,* 97 Idaho 444, 448, 546 P.2d 399, 403 (1976). Fair market value may, of course, be less than cost, as recent traders in gold and silver boullion can attest. Thus, even assuming that HomeGuard was guilty of "selling at a loss," such a finding would not constitute a violation of the provisions of I.C. § 48–104 which prohibits the selling of "any article or product at less than its fair market value . . . ."

While "selling at a loss" might be one factor for a court to consider in determining whether or not specific intent exists to drive a competitor out of business, as in the case of an attempted monopoly under I.C.

§ 48–102,[20] without additional proof and findings of fact, "selling at a loss" does not constitute a violation of the prohibition in I.C. § 48–104 prohibiting the selling of "any article or product at less than its fair market value . . . ." The record would not support a finding that Intermountain Gas sold below fair market value, assuming such a finding had been made. For these reasons, the court's conclusion that Intermountain Gas violated I.C. § 48–104 must be reversed.

### III

### DAMAGES

*A. Standard of Proof.*

▮ There are three essential elements in every private antitrust action: (1) a violation of the antitrust law, (2) direct injury to the plaintiff from such violations, and (3) damages sustained by the plaintiff. Therefore, a finding of a violation by itself does not result in liability. *Windham v. American Brands, Inc.,* 565 F.2d 59, 65 (4th Cir. 1977), *cert. denied* 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978). While the fact of injury must be established with reasonable certainty,[21] a less rigid standard of proof is imposed with respect to the amount of damage caused by an antitrust violation, because economic harm in such actions is difficult to quantify. *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562–65, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931); *Copper Liquor, Inc. v. Adolph Coors Co.,* 624 F.2d 575, 580 (5th Cir. 1980). "The [factfinder] may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly." *Bigelow v. RKO Radio Pictures,*

---

**20.** Note 15, *supra,* discussing "selling below cost" is also applicable to the use of "selling at a loss" as a standard for proving antitrust violations.

**21.** Injury arising out of a defendant's antitrust violation is an element of proof in establishing civil liability under I.C. § 48–114, since injury to a person's business is essential to the cause of action. *See, e.g., Winckler & Smith Citrus Products Co. v. Sunkist Growers, Inc.,* 346 F.2d 1012, 1014 (9th Cir. 1965), *cert. denied* 382 U.S.

958, 86 S.Ct. 433, 15 L.Ed.2d 362 (1965). In view of our conclusion concerning the alleged antitrust violations in the liability section of this opinion, it is unnecessary to further address the question of liability as it relates to the requirement of injury to business. However, we discuss the question of damages at this point to show that even lacking a failure of proof as to liability, the judgment would still have to be reversed on the separate basis that proof of damages is lacking.

327 U.S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946). "[I]t will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. at 563, 51 S.Ct. at 250. Nevertheless, the factfinder may not determine damages by mere speculation and guesswork, and there must be a reasonable foundation established by the evidence from which the factfinder can calculate the amount of damages. *Bigelow v. RKO Radio Pictures, supra; Story Parchment Co. v. Paterson Parchment Paper Co., supra; Copper Liquor, Inc. v. Adolph Coors Co., supra; City of Mishawaka v. American Electric Power Co., Inc.*, 616 F.2d 976, 987 (7th Cir. 1980), *cert. denied*, 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981); *Keener v. Sizzler Family Steakhouses*, 597 F.2d 453, 457 (5th Cir. 1979); *Webb v. Utah Tour Brokers Ass'n*, 568 F.2d 670, 677 (10th Cir. 1977); *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906 (2d Cir. 1962), *cert. denied* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962); *I. L. C. Peripherals Leasing Corp. v. IBM Corp.*, 458 F.Supp. 423 (N.D.Cal.1978).

Based upon the standards set out in the foregoing authorities, there was no justification in the present case for the trial court's determination that the gross revenues of the defendant Intermountain Gas Company and IGCP provide a reasonable foundation for calculating the lost profits of plaintiffs. Such a method of figuring damages assumes, without any support in the record, that the HomeGuard operation would not have won any portion of the insulation market absent antitrust violations. Furthermore, it assumes that the plaintiffs had the capacity to assimilate all of the business which HomeGuard performed, and that plaintiffs would have won that business over other insulators who chose not to participate in this action. There is simply no evidence in the record to demonstrate a relationship between Home-

Guard's sales figures and plaintiffs' damages so as to support a conclusion that HomeGuard's income was the equivalent of plaintiffs' lost profits.

Nevertheless, even first assuming such a method of proving damages is permissible in this case, still there were fundamental errors in its application. Foremost, is the trial court's failure to distinguish the revenue of Intermountain Gas Company prior to June 1, 1977, from the revenue of IGCP after June 1, 1977. No finding was made that IGCP was merely the *alter ego* of Intermountain Gas, and therefore not a separate entity,[22] and yet the judgment was rendered solely against Intermountain Gas. Under such circumstances, to base plaintiffs' lost profits on gross sales achieved by both corporations is clearly erroneous. In addition, the court's use of a 15% profit factor to establish sub-market lost net profits was pure speculation. Few of the plaintiff insulators testified in any respect as to what their net profit margin was or should have been. Furthermore, there is no basis for assuming that all of the plaintiffs operated on the same profit margin. Indeed, it would be either astounding or suspicious if they did. The injection of such a speculative profit factor into the damage equation is of itself erroneous.

Turning to the use of defendant's sales figures as a basis for calculating plaintiffs' lost profits, only two cases appear to have permitted the use of the defendant's sales figures in determining damages to the plaintiff due to defendant's antitrust violations. In the first case, *Cherokee Laboratories, Inc. v. Rotary Drilling Services, Inc.*, 383 F.2d 97 (5th Cir. 1967), the Court permitted a projection of lost profits using the defendant's total sales figures. However, later in *Household Goods Carriers Bureau v. Terrell*, 417 F.2d 47, 53 (5th Cir. 1969), that same court refused to permit that method of proof of damages, holding that, "*Cherokee* does not authorize plaintiff to assume defendant's sales figures without other evidence in support [of] such a proposition.

---

**22.** It should be noted that had such a finding been made, of necessity any claim of conspir-

acy between Intermountain Gas and IGCP would have to fail. See note 13, *supra.*

There must be some evidentiary basis to support an inference as to loss of net profits." The Court pointed out that *Cherokee* was based upon the unique fact that the product market in that case was limited to only the plaintiff and the defendant, that plaintiff had originally developed the market, and that due to defendant's antitrust violations "the defendant *replaced* the plaintiff as the *sole* distributor of the product." *Id.* This conclusion was affirmed by the Fifth Circuit *en banc* in *Household Goods Carriers Bureau v. Terrell,* 452 F.2d 152, 159 (5th Cir. 1971).

It is clear that the present case does not involve a defendant which has replaced its only competitor as the sole distributor in the market. In fact, the situations in *Cherokee* and in the case at bar could hardly be more distinguishable. The record in the

present case discloses that the insulation market during the relevant time period was rapidly expanding and very competitive due to the increased cost of heating resulting from the energy crisis. It also reveals that HomeGuard was merely one of a number of new competitors entering the insulation market and that even with HomeGuard's entry into the market the sales of most insulators continued to increase. The evidence indicates that HomeGuard lost many of its own bids to competitors and that plaintiffs lost jobs to competitors other than HomeGuard.[23] Also, as noted, a substantial number of possible competitors for portions of HomeGuard's market share requested exclusion from this action. We conclude that as was the case in *Household Goods Carriers Bureau v. Terrell, supra,*

---

**23.** Norman Leavitt, a regional manager for HomeGuard, testified as follows:

"Q. Is there a reason why the highest percentage of your product was sold in the Idaho Falls area?

"A. Yes, sir.

"Q. What was that reason?

"A. I couldn't match the price [in the Pocatello area]. I was told when I went over there that I either sold it at the price set— and consequently that's why I could get a better price out of it by going to Idaho Falls and still make, mark it up enough to pay for my travel time to go to Idaho Falls.

"Q. Were you underbid in Pocatello?

"A. Every day.

"Q. As to Pocatello and the surrounding area, excluding Idaho Falls, what percentage during your tenure there at Idaho Falls, what percentage of the bids did you obtain or not obtain?

"A. Residential bids, I would assume or guess that I probably obtained in the neighborhood of 25 per cent of the bids that I did give.

"Q. And you lost 75 per cent then?

"A. Yes, sir.

"Q. In the Idaho Falls area would that figure be different?

"A. The Idaho Falls area we probably got 40 per cent of the ones we gave." Tr., Vol. 4, pp. 638–39.

It should be noted that none of the plaintiff witnesses were insulators from the Idaho Falls area.

Joseph Becker, a Pocatello insulator, testified as follows:

"Q. Mr. Becker, what do you mean by you refused to lower your price; in comparison to what?

"A. Well, below cost or down to cost.

"Q. And who was—

"A. Consequently I lost percentages of the market area.

"Q. And who gained them as a result of that?

"A. *Mr. Holden* [Okay Insulation]. And hearing his testimony, he tried to meet cost competition. I didn't. If I was just in the insulation business, I might have had to look at it differently. But I don't believe that one phase of the business should be run at cost or below just to say that you are in it.

"Q. What was the cost or below, the competition that you had to meet?

"A. I believe it was HomeGuard and *Okay Insulation.*

"Q. All right. And Mr. Cottle?

"A. If they were meeting it." Tr. Vol. 4, p. 543 (emphasis added).

Dale Chappell, a Nampa insulator, testified as follows:

"Q. What is your market area?

"A. Basically the Nampa and Caldwell area.

"Q. Now, in that relationship have you encountered any competition within the last two years?

"A. Yes. We had a lot of competition in the last two years.

"Q. What is that?

"A. Basically new insulation companies coming in and especially competition lowering prices.

"Q. What has that been, Mr. Chappell?

"A. The companies?

"Q. Yes.

"A. Well, HomeGuard is *one* of them. ...." Tr. Vol. 4, pp. 545–46 (emphasis added).

there is no evidence in this record to support the proposition that plaintiffs may assume defendant's sales figures as proof of damages under *Cherokee v. Rotary Drilling Services, Inc., supra.*

In the second case, *Rangen, Inc. v. Sterling Nelson & Sons*, 351 F.2d 851 (9th Cir. 1965), *cert. denied* 383 U.S. 936, 86 S.Ct. 1067, 15 L.Ed.2d 853 (1966), which is relied on by respondents, the plaintiff, Sterling Nelson, was found to have been excluded for four years from participation in competitive bidding to supply fish feed to the State of Idaho due to the defendant's bribing of a public official in violation of Section 2(c) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(c) (1964). The trial court found from the evidence presented that during the relevant four year period in which Rangen had obtained the Idaho contracts for fish feed, three other competitors, including Sterling Nelson, had also bid for the Idaho business. It was also found that subsequent to discovery of the bribery, and its elimination, Sterling Nelson won the next bid. On the basis of that evidence, the court concluded that Sterling Nelson would have obtained 25% of the Idaho business obtained by Rangen, and was entitled to damages based upon 25% of Rangen's sales of fish feed to the State of Idaho during that four year period. Sterling Nelson was not awarded damages based upon Rangen's total sale of fish feed to all of its customers, but rather only on the basis of the specific account which it identified as being lost through Rangen's violations. Thus, *Rangen* does not justify the appropriation of Home-Guard's total sale figures as a basis for calculating plaintiffs' damages.

### B. Evidence.

█ Notwithstanding the use of an improper measure of lost profits by the trial court, the plaintiffs have also failed to provide an evidentiary foundation to enable a reasonable determination of damages under any legally acceptable measure. *Herman Schwabe, Inc. v. United Shoe Machinery Co.*, 297 F.2d 906 (2d Cir. 1962), *cert. denied*

369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962). To meet the minimum requirement of proof in market exclusion cases in which lost profits are sought, the plaintiff must normally produce evidence falling into one of the following categories: (1) comparison of plaintiff's performance before and after the wrongful conduct under otherwise similar conditions, *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1947); *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 376–78, 47 S.Ct. 400, 404–05, 71 L.Ed. 684 (1927); *Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1206–07 (9th Cir. 1975), *cert. denied* 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976); (2) comparison of performance of plaintiff's business, with comparable business in an unrestrained market otherwise comparable to plaintiff's market, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Bigelow v. RKO Radio Pictures, Inc., supra; Richfield Oil Corp. v. Karseal Corp.*, 271 F.2d 709, 714–15 (9th Cir. 1959), *cert. denied* 361 U.S. 961, 80 S.Ct. 590, 4 L.Ed.2d 543 (1960); or (3) loss of specific business or customers, *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906, 913 (2d Cir. 1962), *cert. denied* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962); *Rangen v. Sterling Nelson & Sons, supra; Murphy Tugboat Co. v. Ship Owners and Merchants Towboat Co.*, 467 F.Supp. 841, 863 (N.D.Cal.1979), *aff'd* 658 F.2d 1256 (9th Cir. 1981).

The record reflects no effort on the part of the plaintiffs to prove damages under any of these or comparable theories. In fact, none of the plaintiffs so much as made an estimate, reasoned or unreasoned, as to how much money they lost due to the alleged antitrust violations by the defendant. The testimony of Ron Pope, a Twin Falls insulator, is representative and graphically illustrates the lack of evidence on the subject of damages:

"Q. Now, you have alleged in your complaint, Mr. Pope, that Intermountain Gas Company or HomeGuard Systems has damaged you. How much?

"A. Dollar-wise or—

"Q. Yes, how much in dollars?

"A. I would have to sit down and do some figures on that.

"Q. How would you figure it?

"A. By taking some of the contractors, for instance, that I have lost to Home-Guard directly when they went into business.

"Q. Anything else?

"A. I could go through my bid sheets and pick out a lot of bids that I had bid that HomeGuard got.

"Q. *You haven't done that, though?*

"A. *No.* I know where a lot of them are. I still have the bid sheets, but I haven't went or—

"Q. Can you testify—

"A. —calculated how much that dollar amount is.

"Q. Can you testify today as to what that dollar amount would be?

"A. *I can't testify today as to the dollar amount.*" Tr., Vol. 3, pp. 365–66 (emphasis added).

Another Twin Falls insulator, Gene Hamilton, similarly testified as follows:

"Q. The next question, 'And could you tell me how much you have been damaged in dollars?' And what is your answer there?

"A. 'No sir, I cannot.'"

Tr., Vol. 3, p. 448.

Additionally, one of the named representatives of the class, Bud Moore, failed to testify or present any evidence at all. In

sum, there is nothing in the record, including the exhibits, to provide a reasonable foundation for calculating lost profits of the plaintiffs. Because of that failure in proof of damages, judgment should have been entered in favor of the appellant.

## IV

### CLASS ACTION

Plaintiffs sought certification as a class action under I.R.C.P. 23(b)(1)(B) and (b)(3)[24] as reflected by the language of their motion requesting certification. The trial court granted the motion without indicating which provision was the basis for certification, and without entering any findings or conclusions explaining the reasons for certification. "An intelligent decision on class certification requires 'at least a preliminary exploration of the merits' of the plaintiff's claim. Based on that exploration, the court must make specific findings establishing that the case satisfies the several requirements for certification." *Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1312–13 (4th Cir. 1978). *See Price v. Lucky Stores, Inc.*, 501 F.2d 1177, 1179 (9th Cir. 1974). Generally, the scope of review of an order denying or granting a motion to maintain a class action is narrow. If the district court properly applies the relevant criteria, its order should be reversed only for an abuse of discretion. *Paton v. La-Prade*, 524 F.2d 862, 875 (3d Cir. 1975); *see Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 245 (3d Cir. 1975). However, where the district court provides no basis for deter-

---

**24.** "RULE 23(b). CLASS ACTIONS MAINTAINABLE.—An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

"(1) the prosecution of separate actions by or against individual members of the class would create a risk of

. . . .

"(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or . . . .

. . . .

(3) the court finds that the questions of law or fact common to the members of the class

predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

mining whether it properly considered the relevant requirements for certification, appellate courts will make an independent review of the record to determine whether certification as a class action was appropriate. Cf. *Caldwell v. Craighead*, 432 F.2d 213, 216 (6th Cir. 1970) (where district court made no determination on certification issue, appellate court made determination based upon the record); *Johnson v. Mathews*, 539 F.2d 1111, 1125 n. 23 (8th Cir. 1976). Accordingly, we now make such a review.

■ The one thing that is evident from the district court's certification order is that class members were given the opportunity to opt out of the suit. Since the right to opt out attaches only to class members involved in a Rule 23(b)(3) class action, and not to class members in 23(b)(1) or (b)(2) actions, see I.R.C.P. 23(c)(2) and (c)(3); *see also* 3B Moore's Federal Practice ¶ 23.55 (1980), it can only be assumed in this case that class action certification was under Rule 23(b)(3). However, the circumstances of this case make it an improper subject for class action status under the requirements of I.R.C.P. 23(b)(3).[25]

I.R.C.P. 23(b)(3) premises certification upon findings that "the questions of law or fact common to the class members predominate over any questions involving individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." In the present case, the common questions of law and fact focus upon whether the defendant committed antitrust violations. However, proof of an antitrust violation is only one facet of an action for civil damages under I.C. § 48–114. That section predicates civil liability upon a showing that a person has been "injured in his business ·or property by any other person or persons by reason of anything forbidden or declared to be unlawful by this chapter." Consequently, not only proof of an antitrust violation is required for a plaintiff to pre-

vail under I.C. § 48–114, but also proof of individual injury, proximate cause, and damages. As was stated in *Windham v. American Brands, Inc.*, 565 F.2d 59, 66 (4th Cir. 1977), *cert. denied* 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978), "While a [private antitrust] case may present a common question of violation, the issues of injury and damage remain the critical issues in such a case and are always strictly individualized."

Certainly where the facts of injury and damages break down into what may be characterized as "virtually a mechanical task, capable of mathematical or formula calculation," the task of proving individual injury and damage is simplified, with the result that common questions of antitrust violations will predominate, and a class action may be the superior method of adjudicating the claims. *Windham v. American Brands, Inc., supra; see, e.g., Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975), *cert. denied* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976).

"Most class action certifications that have been permitted even though proof of damages may be a matter of individual proof appear to involve situations where establishing individual damages at least follows an easily ascertained standard pattern. The classic type of price fixing case where it can be established that each unit sold was at an inflated fixed dollar amount per unit, and individual damages require only proof of the number of units purchased by each claimant, makes class action treatment appropriate. Where, however, individual damages require extensive individual proof of local and varying market conditions to prove loss of profits, the task becomes enormously more complicated." *Windham v. American Brands, Inc.*, 68 F.R.D. 641, 654 (D.S. C.1975), *aff'd* 565 F.2d 59 (4th Cir. 1977), *cert. denied* 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978).

Thus, where the issues of injury and damages do not lend themselves to such me-

25. It is assumed for the purposes of this discussion that the prerequisites of I.R.C.P. 23(a) are met in this case.

chanical patterns, but require mini-trials of numerous individual claims,[26] courts have found that the staggering problems of logistics thus created make the damage aspect of the case predominant. *Windham v. American Brands, Inc.*, 565 F.2d at 68; *see Trecker v. Manning Implement, Inc.*, 73 F.R.D. 554, 563 (N.D.Iowa 1976); *Ralston v. Volkswagenwerk, A. G.*, 61 F.R.D. 427, 433 (W.D.Mo.1973); *Shaw v. Mobil Oil Co.*, 60 F.R.D. 566, 570 (D.N.H.1973).

In the present case the claims of plaintiffs are not susceptible of proof by any set method of mathematical or formula calculation. Rather, each plaintiff's claim of lost profits rests in fact upon highly individual traits of each business. There are many factors, particularly in this case, which would have a bearing upon each plaintiff's claim of injury and lost profits, including for example, volume of business, overhead, geographical area of competition, types of insulation work performed, and the character of other competition in the area. Such factors, plus the condition of rapid expansion in the insulation market itself, all point to the conclusion that proper proof of injury and damages for each plaintiff in this case would be highly individualized and would require separate proceedings for fair adjudication. Furthermore, the problem is exacerbated in the instant case due to the allegation of multiple antitrust violations. *See Windham v. American Brands, Inc.*, 565 F.2d at 67. For example, it is clear that the claims of selling below cost and of cornering the market in fiberglass are distinct, requiring different proof of violation, as well as injury and damages, and that such claims may not necessarily be common to all of the potential class members. In addition, the efficiency of a common trial on

liability is questionable in this case since much of the evidence of antitrust violations would have to be repeated in each mini-trial on injury and damages for the purpose of establishing individual proximate cause. It is therefore our conclusion that individual questions predominate over those common to the potential class members, and that a class action is not superior to other available methods for the fair and efficient adjudication of the claims in this case.

Consequently, in view of our conclusion that this case was not properly certified as a class action, only those plaintiffs who were designated class representatives or those who have presented evidence and failed to prove their case below, *see* n. 6, *supra*, are bound by this decision.[27] Other potential plaintiffs remain free to individually pursue their claims.[28] The judgment is reversed and remanded with directions to enter judgment for the defendant Intermountain Gas Company. Costs to appellant.

McFADDEN and DONALDSON, JJ., concur.

SHEPARD, J., dissents without opinion.

BISTLINE, Justice, dissenting.

I.

The district court found that "Homeguard was wholly financed by Intermountain initially out of its General Fund which included retained earnings from the utility function and from which dividends to Intermountain stockholders were to be paid." In other words, Intermountain was using state sanctioned, essentially guaranteed monopoly dollars to compete in an unregulated

26. While many of the cases denying certification on this basis involve thousands of potential class members, the same principles have been applied to deny certification of much smaller groups as well. *See, e.g., Shaw v. Mobil Oil Co.*, 60 F.R.D. 566 (D.N.H.1973).

27. Bud Moore was the only designated class representative not testifying at trial.

28. The statute of limitations on these claims was tolled by the class action proceedings up to

this point. *See American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). "[T]he rule most consistent with ... class action procedure must be that the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Id.* at 554, 94 S.Ct. at 766.

field.[1] I cannot agree with the majority's approval of this practice. The majority apparently believes that so long as the arena of competition is outside of the "distribution chain" of the monopolized product or service, the use of state-guaranteed monopoly dollars to compete with businesses that must borrow at current interest rates is not relevant to the question of whether there has been an attempt to monopolize. I find no authority for such a position, nor does the majority cite to any.[2] In fact, it appears that:

> "Notwithstanding the many cases that have treated the subject of antitrust practices, we have been cited to none that deal with the question of whether a utility already possessed of a legal monopoly may, in the service of that monopoly, avail itself of the peculiarities of utility rate-making to sell below cost in an underlying field of competition. No case has considered whether a subsidiary monopoly thus obtained offends the antitrust laws." *Southern Blowpipe & Roofing Co. v. Chattanooga Gas Co.*, 360 F.2d 79, 81 (6th Cir. 1966), *cert. denied*, 393 U.S. 844, 89 S.Ct. 126, 21 L.Ed.2d 114 (1968).

Although *Southern Blowpipe* was decided in 1966, the same paucity of case law on this precise issue persists today.

The majority states that the "leverage" given IGCP by its use of monopoly dollars "is not uniquely held by monopolists," and concludes that such leverage "does not necessarily present a greater danger than would the use of the same financial power by a non-monopolist." The majority here confuses the issue by assuming that the danger is posed only by the *amount* of money used as leverage. The problem, however, stems not only from the amount of money, but also from its source. If regulated utilities, which have a virtually guaranteed income, are allowed to use ratepayer dollars [3] to directly participate in secondary markets, then the "leverage" enjoyed by the utilities arises out of both the *amount* of money they are able to invest *and the captive market which supplies those funds.* Unlike natural monopolies or financiers with no monopoly but a great deal of capital, regulated utilities are not vulnerable to competition from other distributors. Consequently, these utilities' funds are not as susceptible to market conditions. Furthermore, and more importantly, losses sustained by direct participation in secondary markets will, directly or indirectly, be borne by ratepayers, including those ratepayers with whose businesses the utility is competing in the secondary market.

The fact that a utility is not allowed to include non-utility costs in the costs used to calculate its allowable rate of return does not mean that rates will not ultimately be affected by utility speculation in secondary markets. A utility certainly has discretion as to how it allocates retained earnings,

1. Intermountain did not seek or obtain the approval of the Public Utilities Commission prior to entering this secondary market. In fact, the P.U.C. ordered Intermountain to divest itself of a different retail business in IPUC Order No. 11507 (reversed for failure to give adequate notice in *Intermountain Gas Co. v. Idaho Public Utilities Commission*, 97 Idaho 113, 540 P.2d 775 (1975)).

2. The majority does assert that *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), supports its conclusion that an anti-trust plaintiff must show (1) monopoly power, (2) an actual restraint of trade, and (3) restraint within the relevant distribution chain before the plaintiff may recover from a regulated utility. *Otter Tail does not* support these conclusions. The fact that an actual restraint was proven in *Otter Tail* does not mean that such is a requirement under I.C. § 48–102. The Court in *Otter Tail* specifically stated that "[t]he record makes abundantly clear that Otter Tail used its monopoly power in the towns in its service area to foreclose competition or *gain a competitive advantage,* or to destroy a competitor, *all* in violation of the antitrust laws." 410 U.S. at 377, 93 S.Ct. at 1029 (emphasis added). Here, IGCP clearly gained an advantage over its competitors in the secondary market by virtue of its access to and use of Intermountain Gas's monopoly dollars.

3. The majority chooses to characterize these funds as "retained earnings" rather than ratepayer dollars. The funds originated from ratepayers, however, and the fact that they were not immediately disbursed to shareholders does not change that fact.

including the discretion to use part of those earnings to acquire new plant or provide increased service. Use of earnings for such purposes would, of course, defray the high cost of borrowing money for plant and services. The foregone opportunity costs of speculating in secondary markets could, therefore, be quite high. The fact that such costs are not considered for regulatory purposes does not mean that they should not be taken into account in determining whether utilities may compete in secondary markets without violating I.C. § 48–102. Furthermore, now that this Court has approved of utilities competing in secondary markets, we are faced with the spectre of utilities *borrowing* to finance their competitive efforts, and thus assuming the risks, including the risk of overextension or bankruptcy, which attend deficit financing. The fact that Intermountain limited its spending to retained earnings in this case should not blind us to the consequences of today's decision. It is not the principal of the thing, it's the principle of the thing.

As one commentator explains, "[a] *Griffith* [4] two-market situation exists when the defendant has monopoly power in one of the markets or on one level of the distribution chain. A violation of section 2 [attempt to monopolize] occurs when this monopoly power is misused in a second market, usually to gain a competitive advantage through the leverage resulting from its dominance in the primary monopoly market." Hawk, Attempts to Monopolize— Specific Intent as Antitrust's Ghost in the Machine, 58 Cornell L.Rev. 1121, 1156 (1973).

Although I would hold as a matter of law that regulated utilities may not use ratepayer dollars to directly compete in secondary markets, I will assume for the sake of argument that such competition is permissible so long as no attempt at monopoly is made in the secondary market. The monopoly's preferred position in the primary market then affects only the quantum of proof required to show an attempt.

As the majority notes at one point in its opinion, a predatory pricing act such as selling below cost may form the basis for an inference of specific intent in an attempt to monopolize. The trial court specifically found that HomeGuard (IGCP) was selling below cost, yet the majority refuses to accept this finding, stating that evidence of the plaintiffs' costs is insufficient. According to the majority, evidence of the defendants' costs is the *only* method of proving that a defendant sold below cost. It is news to me, and may surprise some members of the bench and bar, that trial courts may not rely on circumstantial evidence to find a particular fact—which is clearly what the court did in this case in regard to the question of whether the defendant was selling below cost. The cost of materials and labor to the defendant may have been less than the cost of materials and labor to the plaintiffs, but once the plaintiffs put on their case this was a matter of proof for the defendant. In the absence of such proof, the trial court was free to conclude that defendant's costs would roughly approximate the costs of plaintiffs for the same items. It may or may not surprise the bench and bar to find the Court drawing different inferences from the evidence presented than did the trial court, despite the occasionally invoked rule concerning deference to the findings of trial courts on factual matters. *See Dalton v. South Fork of Coeur d'Alene River Sewer District*, 101 Idaho 833, 623 P.2d 141 (1980); *Javernick v. Smith*, 101 Idaho 104, 609 P.2d 171 (1980); *Higginson v. Westergard*, 100 Idaho 687, 604 P.2d 51 (1979); *Buckalew v. City of Grangeville*, 100 Idaho 460, 600 P.2d 136 (1979); *Roemer v. Green Pastures Farms, Inc.*, 97 Idaho 591, 548 P.2d 857 (1976); *Prescott v. Prescott*, 97 Idaho 257, 542 P.2d 1176 (1975); *Comish v. Smith*, 97 Idaho 89, 540 P.2d 274 (1975); *Pierson v. Sewell*, 97 Idaho 38, 539 P.2d 590 (1975); *Planting v. Board of County Commissioners*, 95 Idaho 484, 511 P.2d 301 (1973), *Hollandsworth v. Cottonwood Elevator Co.*, 95 Idaho 468, 511 P.2d 285 (1973); *Johnson v. Joint School District No. 60, Bingham County*, 95 Idaho

---

**4.** *United States v. Griffith*, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948).

317, 508 P.2d 547 (1973); *Church v. Roemer*, 94 Idaho 782, 498 P.2d 1255 (1972); *Ivie v. Peck*, 94 Idaho 625, 495 P.2d 1110 (1972); *Thompson v. Fairchild*, 93 Idaho 584, 468 P.2d 316 (1970); *Boise Junior College District v. Mattefs Construction Co.*, 92 Idaho 757, 450 P.2d 604 (1969); *Huppert v. Wolford*, 91 Idaho 249, 420 P.2d 11 (1966). As to the significance of below-cost pricing in attempt-to-monopolize cases:

"Pricing below cost is a severely anticompetitive tactic frequently engaged in by corporations with significant resources to drive weaker competitors from the field. While the consumer may be the immediate beneficiary of the price struggle, if the tactic succeeds he will eventually be subject to the economic strength and therefore the discretionary pricing of the survivor. In the meantime, competitors will be driven out, not by the superior efficiency of the larger entity, but rather by the greater resources which enable it to sustain temporary losses for a longer time.

"... There is little doubt that if a monopolist, other than a natural monopolist, were to engage in below-cost pricing with the purpose of acquiring or maintaining a monopoly, Section 2 would be violated." *Ovitron Corp. v. General Motors Corp.*, 295 F.Supp. 373, 378 (S.D.N.Y. 1969).

Although the majority downplays the significance of the trial court's finding on this particular predatory pricing practice because of the lack of evidence on or analysis of defendant's inventory and dates of purchase, this does not preclude the trial court from finding as it did. The defendant's inventory and dates of acquisition and sale might be relevant if, for example, there were a possibility that the defendant had overstocked and was selling below cost merely to reduce inventory. The short length of time in which defendant competed in this particular market, however, makes such a possibility extremely unlikely. Furthermore, it is apparent that the trial court included *both* product and installation

costs in determining whether IGCP sold below cost. Labor is unquestionably a "cost" in the insulation business, since installation is frequently tied to the product. Thus, even accepting the majority's unreasonably narrow definition of "product" as used in I.C. § 48–104, the fact that IGCP's overall retail business, which included installation *services*, operated *at a loss*, at a minimum supports the court's finding that IGCP sold below "cost." As to whether the record will support an inference that a dangerous probability of monopoly occurred, I refer again to Professor Hawk.

"The dangerous probability doctrine has not been utilized in two-market 'misuse of monopoly power' situations. Neither *Griffith* nor *Otter Tail* appears to require a dangerous probability of success in the nonmonopoly market, and lower courts have not imposed a dangerous probability requirement in *Griffith* situations. The absence of this requirement is justified on the grounds that the defendant already enjoys a monopoly in one market and that it is the leverage power itself which is allegedly the underlying evil in this situation.

. . . .

"While the lower courts often have expressed indecision on whether an attempt to monopolize or actual monopolization is the proper offense, *Griffith* situations have almost invariably been examined under criteria different from those applied to attempt claims generally. This special treatment is likely to continue in the wake of *Otter Tail*.[5] The typical *Griffith* attempt to monopolize case involves integrated producers with a monopoly on one level of production who engage in supply squeezes, price squeezes, boycotts, and other conduct directly harmful to competitors in one of the nonmonopoly markets. The courts have displayed little hesitancy in finding an unlawful attempt or a sufficient attempt allegation under the *Griffith* misuse of monopoly power rationale. Meaningful recourse is rarely made to the *Swift* for-

5. *But see* majority opinion, *supra.*

mulation or to other familiar approaches to attempt to monopolize claims.

"According to traditional antitrust theory, anticompetitive dangers in a *Griffith* situation arise primarily from the leverage existing in a monopoly market and used to gain an advantage in a second market or distribution level. As monopoly power magnifies the anticompetitive effects of restrictive business conduct or increases the potential for abuse, a holder of such power operating in a second market or on a different level of the distribution chain should be subject to a stricter standard than that applied to a nonmonopolist operating either in one or in several markets. This higher standard is embodied in the *Griffith* test of misuse of monopoly power.

"The restrictiveness of the *Griffith* test makes it preferable to any of the conventional formulations of attempt offenses, such as specific intent and dangerous probability. Moreover, treatment of *Griffith* situations as a separate problem serves the welcome purpose of focusing attention on the controversial concept of 'leverage' upon which the courts base their severe attitudes toward *Griffith* situations." *Hawk, supra,* 58 Cornell L.Rev. at 1155–58 (footnotes omitted).

*At a minimum,* the degree of proof of "dangerous probability" required to show an attempt by an existing monopoly to capture a secondary market should be less than the degree required to prove attempt by a non-monopoly. The record provides such proof in this case. To my mind there will *always* be a dangerous probability that an existing, state-sanctioned monopoly will succeed in an attempted monopolization (providing an attempt is otherwise shown), simply by virtue of its preferred position in its primary market. *See, e.g., Union Carbide & Carbon Corp. v. Nisley,* 300 F.2d 561, 568 (10th Cir. 1962), *cert. dismissed,* 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46.

## II.

The majority's analysis of the damage award will seem inconsistent to some. The majority rejects the trial court's findings on liability on the theory that no conspiracy could have existed between Intermountain Gas and IGPC because they were so closely linked, but then criticizes the trial court because of its "failure to distinguish the revenue of Intermountain Gas Company prior to June 1, 1977, from the revenue of IGCP after June 1, 1977. No finding was made that IGCP was merely the *alter ego* of Intermountain Gas . . . ." In any event, it is the use of monopoly funds to compete that causes the damage in this case, and there is no contention that IGCP did not continue to use Intermountain's monopoly funds after it was separately incorporated.

The 15% profit figure supplied by the trial court is very reasonable—even conservative for the retail business, and the majority cites no cases which hold that incorporating a reasonable percentage profit *based on known and proven* sales figures is improper. The majority's citation to *Household Goods Carriers' Bureau v. Terrell,* 417 F.2d 47 (5th Cir. 1969), is inapposite. *No* sales figure were proven there— the *amount* of sales was simply guesstimated. In this case the record does disclose actual sales, and *Household Carriers'* does not bar application of a reasonable profit percentage to those figures in the calculation of damages. As the majority notes but then ignores, "[w]hile the fact of injury must be established with reasonable certainty, a less rigid standard of proof is imposed with respect to the amount of damage caused by an antitrust violation, because economic harm in such actions is difficult to quantify." (Footnote omitted.)

Since Intermountain Gas *qua* Homeguard *qua* IGCP was improperly in the insulation business to begin with, using total sales as a method of calculating plaintiffs' lost profits certainly was reasonable. Any inquiry into the share of the market which Intermountain would have captured in the absence of forbidden practices is therefore unnecessary. And since the majority's primary objection to the class certification under I.R. C.P. 23(b)(3) is the speculative nature of individual damages, once it is seen that the

damage award was proper the class certification must, under our narrow scope of review, also be held to be valid. I do agree, however, that it was improper to award all of the damages to the nine testifying plaintiffs. This improperly excluded other members of the class, who should have been notified and allowed to petition for their proportionate share of the damages. I would *remand for modification of the judgment* to so provide, a procedure which the majority apparently does not view as appropriate, despite the fact that remand for recalculation of damages is the usual remedy if an improper formula is employed by the trial court in calculating damages. *See Hafer v. Horn*, 95 Idaho 621, 515 P.2d 1013 (1973). At a minimum, nominal damages should be allowed. Nominal damages may be awarded despite the impossibility of calculating actual damages, so long as a breach of contract or tortious conduct is shown. *See Comfort Homes, Inc. v. Peterson*, 37 Colo.App. 516, 549 P.2d 1087 (1976); *State v. Larson*, 539 P.2d 352 (Wyo.1975). *See, e.g., Bowler v. Board of Trustees*, 101 Idaho 537, 617 P.2d 841 (1980).

I dissent.