736 P.2d 1361

Henry **FERNANDEZ**, d/b/a Henry's Scrap Metals,
Plaintiff-Counter-defendant-Appellant,

v.

**WESTERN RAIL ROAD BUILDERS, INC.**, a corporation,
Defendant-Counter-claimant-Respondent.

No. 16162.

Court of Appeals of Idaho.

April 21, 1987.

Robert C. Paine of Webb, Burton, Carlson, Pedersen & Paine, Twin Falls, for plaintiff-counterdefendant-appellant.

Ron Kerl of Green, Service, Gasser & Kerl, Pocatello, for defendant-counterclaimant-respondent.

PER CURIAM.

This case presents issues of mutual mistake and revocation of acceptance in a commercial transaction. Western Rail Road Builders, Inc., purchased four items of used railroad maintenance equipment from Henry Fernandez, a salvage dealer in Pocatello. It turned out that two of the machines could not perform all functions that such machines ordinarily perform. Fernandez brought this action to collect the sales price of the two machines. Western counterclaimed, seeking to rescind the sale. The district court held that the parties acted under a mutual mistake of fact concerning the machines' capabilities. The court granted Western's request for rescission. Fernandez has appealed. For reasons that follow, we vacate the judgment and remand the case.

## I

The facts essential to our decision are as follows. At an auction Fernandez acquired several items of used railroad equipment owned by the Union Pacific Railroad, including two Plasser track maintainer tampers (TMTs). Fernandez was informed by a mechanic for the Union Pacific that the TMTs had been rebuilt by the railroad. Fernandez distributed advertisements stating that railroad equipment was for sale. The Plasser units were identified as "TMTs" and were described as "rebuilt." The information in the advertisement came to the attention of Western, which was in the business of building and maintaining railroad tracks.

David Durbano, president of Western, traveled to Pocatello with his foreman to look at the equipment. They examined the two TMTs and other equipment for more than an hour. Batteries, hoses, switches and other components were missing from the TMTs. The machines were not started or operated at this time. Durbano did not inform Fernandez of his intended use of the equipment. Fernandez made no representations to Durbano concerning the functions of the TMTs except to say they had been "rebuilt" by the Union Pacific. The parties reached an agreement in which Western purchased the two TMTs, as well as a Universal joint tamper and a Pettibone car mover, for a total of $36,000, plus $1,000 ($250 per item) for freight.[1] Western made a $5,000 down payment, the balance to be paid in one week.

The equipment was delivered to Western's facility at Ogden, Utah, three days later. Upon Durbano's request, another mechanic from the Union Pacific inspected the two TMTs. He reported that they lacked parts necessary to perform certain functions. A TMT of the type sold to Western was designed to perform three main functions: lifting the track, aligning it, and tamping the ballast under the ties. The Union Pacific's mechanic informed Durbano that the units he inspected could perform only the tamping function.

Fernandez visited Western's facility shortly after the mechanic made his report. Durbano informed Fernandez that the TMTs were missing parts required for the

---

1. Durbano testified at trial that one new TMT alone would have cost at least $100,000. Fernandez testified that a new unit could have cost as much as $200,000.

lifting and aligning functions. Fernandez and Durbano then viewed a complete TMT at a different location where they could readily observe some of the parts missing from the used TMTs. Fernandez told Durbano he would supply any missing items that he might have in his yard at Pocatello. Durbano issued a check for the remaining balance of $32,000. On the next day, Union Pacific's mechanic inspected the TMTs again and concluded that it would be "virtually impossible" to make the TMTs perform all three functions. No additional parts were found. Western stopped payment on its check. This lawsuit followed.[2]

The trial court, in holding that the parties had been mutually mistaken about the functions of the TMTs, treated the case as one arising in equity. The judge directed Fernandez to reimburse Western's payment of $32,000, less $500 in delivery charges for the Universal joint tamper and the Pettibone car mover. Correlatively, the judge directed Western to return the TMTs to Fernandez at Western's expense. The judge did not reach issues raised in the pleadings concerning application of the Uniform Commercial Code. Fernandez appealed.

## II

An uneasy relationship exists between equity and the Uniform Commercial Code. *See generally* Summers, *General Equitable Principles Under Section 1–103 of the Uniform Commercial Code*, 72 N.W. U.L.REV. 906 (1978). General principles of law and equity "supplement" the UCC and may be applied "[u]nless displaced by the particular provisions of [the Code]. . . ." I.C. § 28–1–103; *see Palmer v. Idaho Peterbilt, Inc.*, 102 Idaho 800, 641 P.2d 346 (Ct.App.1982). Consequently, a judicial inquiry often starts with the UCC, to determine whether the Code provides a definitive answer to the question at hand. However, where an equitable principle calls into question the validity or existence of a com-

mercial contract, it may raise a threshold question. The doctrine of mutual mistake is such a principle. It may be employed either to set aside a contract or to declare that no contract ever was formed. D. DOBBS, REMEDIES § 11.3 (1973) (hereinafter "DOBBS"). Because the latter point is embraced by Western's claim for rescission, we turn immediately to the mutual mistake issue.

■ With due respect to the district judge, we disagree with his conclusion that a "mistake" justifying equitable relief occurred in this case. Generally speaking, a contract is susceptible to three primary kinds of mistakes—mistake during formation of the contract, mistake in the integration (writing) of the contract, and mistake during performance of the contract. DOBBS § 11.1. Here, the alleged mistake occurred during formation. Western asserts that when the contract was negotiated, the parties were mutually mistaken about the functions the used TMTs could perform. However, we note that this "mistake" in no way concerned the identity or existence of the goods sold. It is undisputed that the used TMTs existed, that the parties identified them with particularity, and that the buyer viewed them before settling on a price. The "mistake" was, at most, a misunderstanding of the value and usefulness of the goods. Ordinarily, in order to trigger a right to equitable relief, "the mistake must be one going to existence or identity of the subject matter. . . . [A] mistake of value or quality is insufficient for relief." DOBBS at § 11.3, p. 723.

Western's position, in essence, is that the absence of certain parts from the used TMTs so limited their functions that their identity was changed as well. The machines became mere "tampers" as opposed to complete "track maintenance tampers." The argument has semantic appeal but, when fully considered, is specious. Function-limiting defects in a product do not

---

**2.** While the litigation was pending, Western's check was honored by the bank despite the stop payment order. Moreover, Western and Fernandez agreed that Fernandez would keep the $5,000 down payment as compensation for the

Universal joint tamper and the Pettibone car remover. Consequently, the lawsuit proceeded upon Western's counterclaim for recovery of its $32,000 payment.

alter the fact that the parties specifically identified the subject matter of their bargain. Indeed, if such defects were deemed to change the identity of the subject matter of a contract, then "mistake" would preempt virtually the entire body of law—including the UCC—dealing with nonconforming goods. This would be contrary to common sense. It also would be inconsistent with the declaration in the UCC, noted earlier, that general principles of equity "supplement" the Code. Accordingly, we hold that there was no "mistake" giving rise to an equitable remedy of rescission in this case.

### III

We now consider the applicable provisions of the UCC. Judicial rescission does not exist by name in the Code. The UCC employs the term "rescission" to signify a mutual agreement by parties to set aside a contract. I.C. § 28–2–209; *Palmer v. Idaho Peterbilt, Inc., supra.* However, when a seller breaches a contract by delivering nonconforming goods, and the buyer seeks to set aside the contract, the Code characterizes the buyer's remedy as "cancellation" of the transaction. Such cancellation may follow the buyer's rejection, or revocation of acceptance, of the nonconforming goods. I.C. §§ 28–2–608, 28–2–711; *Lee v. Peterson*, 110 Idaho 601, 716 P.2d 1373 (Ct.App.1986). In this case Western initially accepted the goods but later sought to revoke its acceptance. The question is whether it was entitled to do so.

The Code provides that a buyer may revoke acceptance of goods if (1) they do not conform to the contract; (2) the nonconformity "substantially impairs" the value of the goods to the purchaser; and (3) the purchaser initially accepted the goods—

(a) on the reasonable assumption that [the] nonconformity would be cured and it has not been seasonably cured; or

(b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

I.C. § 28–2–608(1).

Of these three requirements, the second—substantial impairment of the value

of the goods to the purchaser—has been established by undisputed facts. It requires no further discussion here. We turn to the first and third requirements. As the ensuing discussion will indicate, these requirements pose a variety of factual problems.

The first requirement is that the goods actually be nonconforming to the contract. Here, the transaction was recorded on a sales ticket that described the goods only by brand name, year and serial number. It did not even refer to the goods as TMTs. The sales ticket plainly was not an integrated expression of the parties' agreement. The entire agreement incorporated oral representations and Fernandez's written advertisement, which described each of the subject items as a "TMT ... REBUILT." Based on undisputed facts, we deem it clear that the goods did not conform to the contract description as rebuilt TMTs. Neither could they fulfill the ordinary purposes for which TMTs are used. Consequently, if Fernandez were deemed to be a merchant with respect to such goods (a status neither established or excluded by the present record), then the goods also would have failed to satisfy an implied warranty of merchantability. I.C. §§ 28–2–104, 28–2–314.

■ Fernandez has argued that the goods did not have to conform to any particular description, or to satisfy a merchantability standard, because they were sold "as is." This argument is based largely on a sales ticket where the hand-written words "as is" appear. These words are almost illegible and are buried in a jumble of similarly written numbers and phrases. Although the UCC does not explicitly require the term "as is" to be conspicuous, an inconspicuously inserted term may fail to "[make] plain that there is no implied warranty." I.C. § 28–2–316(3)(a). Here, in our view, the sales ticket alone would not suffice to disclaim an implied warranty or to exclude reliance upon a contract description.

Fernandez also appears to rely on a bill of sale which stated that the goods were

"sold as accepted and ... not guaranteed." However, this document was prepared by Fernandez after the goods had been delivered. Standing alone, it would appear to be a unilateral expression, not a recital of bargained terms.

■ However, an issue exists as to whether these documents did, in fact, stand alone. Fernandez testified that the parties orally agreed that the sale would be "as is." Western's witness, Durbano, conceded that the phrase "as is" had been mentioned during negotiations. However, he said the words were used merely to signify that the machines were "rebuilt" rather than new. This conflicting evidence precludes us, as an appellate court, from saying whether the parties shared a common understanding about the "as is" nature of the transaction.

Issues also exist with respect to the reasonable expectations of a party who purchases from a salvage dealer like Fernandez. Any implied warranty of merchantability might have been "excluded or modified by course of dealing" in the salvage trade. I.C. § 28–2–316(3)(c). The record contains little evidence on this point. Moreover, the buyer's conduct may be important. If "the buyer before entering into the contract ... examined the goods ... as fully as he desired ... there [would be] no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him...." I.C. § 28–2–316(3)(b). On this point, our summary of the facts has indicated that the used TMTs were inspected in Pocatello. However, the district judge did not determine, nor does the record clearly show, that the goods then were examined "as fully as [Western] desired." Neither is it clear whether the significance of the missing parts "ought" to have been apparent at that time. This would depend largely upon the skill and knowledge of Western's personnel. *See* comment 8 to I.C. § 28–2–316; J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE § 12–6, at p. 452 (2d ed. 1980).

Of course, after the goods were delivered in Ogden, Western was made aware of the significance of the missing parts by the mechanic's report. When Fernandez arrived in Ogden, and was confronted with Western's concerns, he offered to make available any additional parts found in his salvage yard. This sequence of events leads us to the third statutory requirement for a valid revocation of acceptance—that the buyer's initial acceptance was premised upon "the reasonable assumption that [the] nonconformity would be cured" or upon "the difficulty of discover[ing]" the full extent of the nonconformity. Analysis of the latter possibility has been subsumed in our foregoing discussion of the buyer's conduct under I.C. § 28–2–316(3)(b). As to the former possibility, we cannot say upon the present record whether the events we have described were so interconnected and so functionally contemporaneous that Western's acceptance of the goods was induced by Fernandez's offer to see whether additional parts were available.

In sum, a host of factual questions remain to be resolved in determining whether the first and third requirements for a valid revocation of acceptance were satisfied in this case. Because the questions are material to the outcome, and do not yield obvious answers on appeal, we must remand for definitive findings. *Pope v. Intermountain Gas Co.,* 103 Idaho 217, 646 P.2d 988 (1982). The judge may, in his sound discretion, take additional evidence pertaining to these questions.

If the district judge finds facts satisfying the requirements for revocation of acceptance, then he should declare the transaction "cancelled," confirming his original judgment for recovery of the purchase price paid (less shipping costs for the equipment not in dispute). I.C. § 28–2–711. Conversely, if the judge finds that the facts do not satisfy all three requirements for revocation of acceptance, then no relief is available under the UCC and Fernandez is entitled to keep the money received.

Accordingly, the judgment of the district court is vacated. The case is remanded for further proceedings consistent with this opinion. Costs, exclusive of attorney fees

912

(which have not been requested), are awarded to appellant Fernandez.