815 P.2d 478

**WARM SPRINGS DEVELOPMENT ASSOCIATES LIMITED PARTNERSHIP, a limited partnership, Plaintiff–Respondent,**

v.

**Richard C. BURROWS, a single person, Defendant,**

**and**

**Judith L. McElvain, a single person Defendant–Appellant.**

No. 18831.

Court of Appeals of Idaho.

Aug. 1, 1991.

James G. Reid and David Hammerquist of Ringert, Clark, Harrington, Reid, Christenson & Kaufman, Boise, for defendant-appellant.

Howard F. Manly, Boise, for plaintiff-respondent.

SWANSTROM, Judge.

Judith McElvain and Richard Burrows leased real property from Warm Springs Development Associates Limited Partnership to operate an alcohol rehabilitation center. McElvain and Burrows signed the lease as individuals but the lease contained a provision allowing them to assign the lease to a wholly-owned corporation. One year into the lease term, McElvain and Burrows exercised this right by assigning the lease to New Hope Centers, Inc., a corporation owned by them. New Hope operated the center under the lease until it began having financial difficulties and was forced to default and file for bankruptcy.

Warm Springs sued McElvain and Burrows for damages resulting from New Hope's breach of the lease. After a bench trial, the district court found that McElvain and Burrows were personally liable and that Warm Springs was entitled to compensation for damages and for unpaid real estate taxes. McElvain appealed from the court's decision, but Burrows did not. McElvain contends that the court erred by holding her liable and by ignoring the corporate status of New Hope. McElvain also objects to the award of damages to Warm Springs and to the manner in which the amount was determined. For reasons explained below, we affirm the judgment entered against McElvain.

■ McElvain asserts that she and Burrows executed the lease as individuals only to obtain a conditional use permit from the city to operate the alcohol rehabilitation center. McElvain testified that the city planning and zoning commission would accept applications for such permits only from individuals, as opposed to corporations. Warm Springs acknowledges that the property was leased for an alcohol rehabilitation center, and the lease confirms this understanding between the parties. However, Warm Springs denies that it agreed to release McElvain or Burrows from their obligations under the lease upon its assignment to New Hope.

This particular controversy centers around Section 7 of the lease:

Section 7. ASSIGNMENT AND SUBLETTING. Without the prior written consent of the Lessor, Lessee shall not assign this lease or any part thereof, *save and except the Lessee may assign this lease without consent to a corporation wholly owned by the Lessee.* A consent by the Lessor to one assignment, subletting or license shall not be deemed to be a consent to any subsequent assignment, subletting or license. An assignment, subletting or license without the prior written consent of the Lessor or an assignment or subletting by operation of law shall be void and shall, at the Lessor's option, terminate the lease; PROVIDING, HOWEVER, that the Lessee shall have the right to rent the apartments in the usual course of business without the consent of the Lessor where such use is permitted under Section 5 of this lease. [Emphasis added.]

The evidence shows that when Warm Springs (the "Lessor") had the lease prepared and submitted to the "Lessee," Section 7 did not contain the italicized phrase. Without the italicized phrase, McElvain

found this section unacceptable. She and Burrows had previously formed the corporation, New Hope Centers, Inc., for the purpose of operating the treatment center. McElvain did not talk to either of the owners of the property. Kendra Sallaz, a real estate agent who located the property as a possible site for the proposed alcohol treatment center, was the contact between McElvain and the owners. McElvain testified that she told Sallaz that she wanted the lease changed to allow an assignment to the corporation. She intended, by the assignment, to avoid personal responsibility. The lease was changed to add the phrase, "save and except the Lessee may assign this lease without consent to a corporation wholly owned by the Lessee." McElvain testified that Sallaz led her to believe that she would not be held liable once she assigned the lease to New Hope. McElvain also testified that she relied on this representation.

The district court decided there was no evidence that McElvain relied on Sallaz' representation about the legal effect of the assignment clause, "or that it would even have been reasonable for her to do so." The court noted that nothing in the lease, or in the conduct of the parties, expressly or impliedly released McElvain or Burrows from liability. The court concluded that the phrase added to the assignment clause served only to prevent a breach in the event the lease was assigned to a wholly owned corporation, thereby insuring that Warm Springs would be dealing with the same people. Based on these findings, the court held that McElvain was personally bound by the lease.

McElvain contends that the general rule concerning the effect of an assignment made with the consent of the lessor can be stated as follows:

in the absence of an express or implied agreement on the part of the lessor to the contrary, the obligations and liabilities of the lessee to the lessor, arising from express covenants in the lease, are not affected by the lessee's assignment of the lease to a third person, and this is true even though the assignment is with the consent of the lessor.

*See generally* 49 AM.JUR.2D *Landlord and Tenant* § 437 (1970). McElvain contends that the assignment took the lease out of the general rule, because she and Sallaz expressly agreed that the assignment would relieve her of liability. McElvain argues that, at the very least, an implied agreement existed between the parties, because Warm Springs should have been on notice, through Sallaz, that the assignment to New Hope would discharge her of any liability. In essence, McElvain claims that Sallaz is Warm Springs' agent and it was reasonable to rely upon Sallaz' representations. McElvain asserts that the court's findings to the contrary are not supported by the record.

Sallaz was not called as a witness by either party. McElvain testified, explaining that she executed the lease as an individual in order to obtain a conditional use permit from "Planning & Zoning," intending, once the business was going, to "turn it over to the corporation." Her entire testimony relative to the representations made to her by Sallaz then followed:

Q. Did you intend on being personally responsible under this lease once it was assigned to the corporation?

A. No.

Q. And is that why paragraph seven was amended in the final version, to allow you to assign it to the corporation?

A. Correct.

. . . .

Q. Why was it important to you to not be personally responsible once it was assigned to the corporation?

A. I would individually have no use for the building except for the business, and that was the corporation's.

Q. Did anyone tell you prior to your signing this lease that you would—that even if you assigned this lease to a corporation, you would still be personally responsible?

A. No.

Q. Were you led to believe exactly the other way?

A. Absolutely.

Q. And by whom?

A. Kendra Sallaz.

This was the extent of the evidence given to the district court about representations made to McElvain. Neither of the owners of the Warm Springs property was asked about communications with Sallaz which resulted in the final wording of Section 7 of the lease. The alleged "representations" made by Sallaz to McElvain are not disclosed. Neither is the basis shown for McElvain's purported reliance upon those undisclosed statements. Accordingly, we cannot say the district court erred in concluding that it was not reasonable for McElvain to place reliance on Sallaz' "legal opinion," as the court characterized it.

■ Here, the court made no findings or conclusions as to whether Sallaz was an agent of Warm Springs. The failure of the trial court to make findings of fact and conclusions of law on a material issue will necessitate a reversal of the judgment and a remand for additional findings and conclusions, unless such findings and conclusions would not affect the judgment. *Pope v. Intermountain Gas Co.*, 103 Idaho 217, 646 P.2d 988 (1982). In this case, reversing and remanding to the district court on the agency question would not be helpful, because such a determination would not affect the judgment. Even if Sallaz were held to be the agent of Warm Springs, there is not sufficient evidence in the record of the agent's representations or of facts to justify McElvain's reliance thereon.

■ Like any contract, a lease is to be construed to give effect to the intention of the parties. *Wing v. Martin,* 107 Idaho 267, 688 P.2d 1172 (1984). The intent of the parties should, if possible, be ascertained from the language contained in the written contract, because usually this represents the best evidence of the parties' intent. *Abel v. School Dist. No. 413,* 108 Idaho 982, 703 P.2d 1357 (Ct.App.1985). Oral statements and negotiations, which occurred prior to the execution of a written contract, are presumed merged therein and will not be admitted to contradict the plain terms of the contract. *Galaxy Outdoor Adver., Inc. v. Idaho Transp. Dept.,* 109 Idaho 692, 710 P.2d 602 (1985).

■ Here, the lease is neither ambiguous nor capable of being construed as an incomplete statement of the terms of the agreement between the parties. "Where a contract is clear and unambiguous, determination of the contract's meaning and legal effect are questions of law to be decided by the court." *Galaxy,* 109 Idaho at 695, 710 P.2d at 605. In this case, McElvain and Burrows signed the lease as individuals. Nothing in the assignment clause alters the other provisions of the lease which require that McElvain be personally bound by the lease. When the contract is clear and unambiguous, the court cannot revise the contract to make a better agreement for the parties. *Id.* Accordingly, we hold that the district court was correct in finding that McElvain was personally liable under the lease.

■ McElvain also claims that a novation occurred when Warm Springs consented to the assignment of the lease. McElvain asserts that, during the negotiation of the lease with Sallaz, Warm Springs agreed to a contract which substituted New Hope for McElvain and Burrows as the sole obligor. Upon assignment, McElvain argues, her obligation was eliminated and New Hope became liable under the lease. However, the parties' intent to cause a novation must be clearly established; consent to an assignment is not enough. *Pink v. Busch,* 100 Nev. 684, 691 P.2d 456 (1984). *See also First National Bank in Evanston v. Sims,* 78 Idaho 286, 301 P.2d 1103 (1956) (mere knowledge and consent of the creditor for a third party to assume the debt will not release the original debtor). "Absent an express novation, a lessee remains in privity of contract with the lessors and is a guarantor for performance of the covenants in the agreement." *George W. Watkins Family v. Messenger,* 115 Idaho 386, 390, 766 P.2d 1267, 1271 (Ct.App.1988), *appeal after remand,* 118 Idaho 537, 797 P.2d 1385 (1990). Here, the evidence is not sufficient to support a finding that there was an express novation. We also hold that the record does not support McElvain's argument—made for the first time on appeal—that to impose liability upon

her, the court had to have "pierced the corporate veil," *citing Pierson v. Jones,* 102 Idaho 82, 625 P.2d 1085 (1981); *Baker v. Kulczyk,* 112 Idaho 417, 732 P.2d 386 (Ct.App.1987). Therefore, we hold that Warm Springs' consent to the assignment did not relieve McElvain of liability.

We now turn to the issue of damages. Three persons testified for Warm Springs about damages to the premises, namely the two partners in Warm Springs: Donald Reed and Tom Wilson, and Terry King, a construction expert hired by Warm Springs to estimate the cost to repair the property. Reed and Wilson testified that the property had been remodeled as an apartment building and was in good condition at the time McElvain and Burrows leased it. King also testified that the property was in good repair at the start of the lease. This testimony was not challenged by McElvain.

After New Hope defaulted on the lease, Reed and Wilson made an inspection of the property. From this inspection, a list was compiled detailing what items were damaged during the term of the lease. King relied on this list when he made an inspection of the property. He later assigned cost estimates for each item on the list. At trial, King testified at length about the amount of damage to the property, and his estimated cost to repair it. King's testimony supported the amount claimed in count two of the complaint. Based on King's testimony, the court awarded Warm Springs the amount claimed in count two. The court also awarded Warm Springs unpaid real estate taxes under count five of the complaint. No damages were awarded on counts one (lost rental), three (missing appliances), or four (certain liens). Despite this evidence, McElvain argues that Warm Springs is not entitled to recover on count two for property damages because they are speculative. McElvain raises three arguments in support of this contention.

■ First, McElvain points out that Warm Springs has not repaired or replaced any of the items that it claims were damaged. She contends that, because these repairs have not been made, the trial court could only estimate as to how much Warm Springs has been damaged. We disagree. When a tenant covenants to keep the premises in good repair, the landlord is not obligated to repair the property at the expiration of the lease, and nothing in this lease prevents Warm Springs from making an agreement with the next lessee to repair the property or accept the premises in the condition that they are in. *See generally* 49 AM.JUR.2D *Landlord and Tenant* § 959 (1970); Annot., *Damages—Breach by Lessee,* 80 A.L.R.2d 983 (1961). To recover damages under count two of the complaint, Warm Springs had only to show that the damages were proved with reasonable certainty. *Hake v. DeLane,* 117 Idaho 1058, 793 P.2d 1230 (1990). This requirement was met through the testimony of King.

■ In McElvain's second argument, she notes that, after New Hope defaulted on the lease, Warm Springs leased the property to a new tenant for use as an alcohol rehabilitation center. McElvain contends that the covenants in this new lease should be considered in determining whether damages were caused by the previous lessee. McElvain points to a statement in the new lease where the lessee acknowledges that the premises are in good order and repair. McElvain argues that this statement indicates that Warm Springs has not been injured. We do not necessarily disagree. The argument was well made. However, the weight to be given this evidence is strictly a matter for the trial court to determine. Substantial evidence was also presented by Warm Springs showing that considerable damage was done to the leased premises during the term of McElvain's lease.

■ In McElvain's third argument, she claims that no damages were incurred by Warm Springs, because the rent received from the new lessee is greater than the rent received under the old lease. McElvain points out that Warm Springs received $2,962 per month in rent under the old lease. Under the new lease, Warm Springs was to receive $3,353 per month. Because the rent under the new lease exceeds the rent under the old lease, McElvain con-

tends that Warm Springs is not entitled to recover damages under count two of the complaint. We disagree. Count two of the complaint sought recovery for damage to the premises; whereas, count one sought recovery for loss of rent. Because the two counts of the complaint are addressing different kinds of damages, the recovery of one does not affect the recovery of the other. The court did not award any damages for lost rent under count one of the complaint. The property damages awarded in count two of the complaint were not affected by Warm Springs' receipt of "excess" rent from the new tenant.

 Without conceding damages, McElvain also objects to the method used by the district court in determining the amount of property damages. The court awarded damages based on the cost of repairing the property. McElvain argues that the proper measure of damages for damage to real property is market value before and after the damage. In this case, the lease provides the answer. The lease requires that the lessee repair any damage to the property at the lessee's expense. Generally, the amount recoverable from a lessee depends on whether the action is commenced before or after the expiration of the lease. When the lease has expired, the cost of repairing the property is the proper measure of damages for breach of the covenant to repair. *Santillanes v. Property Management Services,* 110 Idaho 588, 716 P.2d 1360 (Ct.App.1986). The fact that the lessor, after the expiration of the term, leases the property to another lessee does not alter the measure of damages for breach of the prior lessee's covenants. *See generally* 49 AM.JUR.2D *Landlord and Tenant* § 979 (1970); Annot., *Damages— Breach by Lessee,* 80 A.L.R.2d 983 (1961). Because this lease was terminated due to a default on the part of the lessee, we hold that the measure of damages should be the same as if the lease had expired. Accordingly, we hold that the court was correct in awarding the cost of repairing the property as the measure of damages.

Finally, McElvain argues that the amount of damages awarded on count two is incorrect. McElvain asserts that the judge's decision did not explain how the $33,108 amount awarded to Warm Springs was determined. Moreover, McElvain insists that the judge erred by including the price of missing appliances in the amount of damages. We disagree. King's testimony on the amount of damages reflects the amount listed in plaintiff's exhibit four. The total repair and replacement costs were $36,958. From this amount, $3,850, representing the cost of replacing the appliances, was disallowed. The remaining amount, $33,108, represents the amount awarded for damages to the property. Because this amount is supported by the evidence, we uphold the award.

The judgment is affirmed. Warm Springs is entitled to costs and attorney fees on appeal under the terms of the lease.

WALTERS, C.J., and SILAK, J., concur.